**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division**

MARTESE JOHNSON,

              Plaintiff,

      v.

DEPARTMENT OF ALCOHOLIC
BEVERAGE CONTROL, JARED MILLER,
THOMAS CUSTER, JOHN CIELAKIE, and
SHAWN P. WALKER

            Defendants.

Civil Action No. 3:15-cv-00055-GEC

## FIRST AMENDED COMPLAINT

Plaintiff Martese Johnson ("Martese"), by and through the undersigned counsel, hereby brings this First Amended Complaint against Defendants the Department of Alcoholic Beverage Control, Jared Miller, Thomas Custer, John Cielakie, and Shawn P. Walker for civil rights abuses in violation of the United States Constitution, federal statutes, and the laws of Virginia, and in support thereof states as follows:

## INTRODUCTION

1.     This matter arises out of the unlawful detention, arrest, and excessive use of force against Martese on March 18, 2015, by Defendants Miller, Custer, and Cielakie, agents of the Department of Alcoholic Beverage Control, and out of the pervasive and unchecked unlawful practices encouraged and knowingly overlooked by the Department.

2.     In the early morning hours of March 18, 2015, Defendants Miller, Custer, and Cielakie (collectively, the "Agents"), brutally assaulted, seized, arrested, and jailed Martese, without probable cause and in violation of the United States Constitution, federal statutes, and

203358203.4

the laws of Virginia, believing (falsely and without sufficient information) that Martese had presented a fake identification card to gain entry to a restaurant and bar on University Avenue in the City of Charlottesville, Virginia.

3.     In fact, Martese's identification card was valid.

4.     The Agents' brutal assault and battery of Martese caused injuries which required ten stitches to his head and face, resulting in permanent scarring and disfigurement.

5.      Moreover, as a result of the Agents' unlawful seizure and arrest, Martese was falsely charged with public intoxication and obstruction of justice.  After reviewing eyewitness testimony, the Commonwealth's Attorney of the City of Charlottesville, Virginia, declined to prosecute Martese.  The General District Court for the City of Charlottesville dismissed both charges in June of 2015.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §1331 (federal question jurisdiction), §1343 (deprivation of civil rights), and §1367 (supplemental jurisdiction).

7.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Martese and all Defendants, and because the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

8.     Personal jurisdiction is proper over all Defendants because they all either reside, work, oversee individuals who work, or have their principal place of business within the Charlottesville Division of the Western District of Virginia.

9.     Venue is proper in this Court under 28 U.S.C. §1391(b) because a substantial part of the events or omissions giving rise to Martese's claims occurred within the Charlottesville

Division of the Western District of Virginia.

<u>PARTIES</u>

10.     Plaintiff Martese Johnson was, at all relevant times, a twenty year-old man and a citizen of the State of Illinois. Martese was, and currently is, an honors student at the University of Virginia.

11.     Defendant Department of Alcoholic Beverage Control ("ABC"), is an agency, which is funded solely through its own revenues and tasked with controlling the distribution of alcoholic beverages and enforcing the laws of the Commonwealth pertaining to alcoholic beverages. ABC is run by a board which directs all agency operations, including promulgating its own regulations and appointing all employees of ABC. The central office of ABC is located at 2910 Hermitage Road, Richmond, Virginia 23220.

12.     Defendant Shawn P. Walker ("Walker") is the Director of ABC. On information and belief, he is a citizen of the Commonwealth of Virginia and operates at 2910 Hermitage Road, Richmond, Virginia 23220. Walker is being sued in his individual capacity.

13.     Defendant Jared Miller ("Miller") is a Special Agent for ABC operating out of 900 Natural Resources Dr. #700, Charlottesville, VA 22903. On information and belief, Miller is a citizen of the Commonwealth of Virginia. Miller is being sued in his individual capacity.

14.     Defendant Thomas Custer ("Custer") is a Special Agent for ABC operating out of 900 Natural Resources Dr. #700, Charlottesville, VA 22903. On information and belief, Custer is a citizen of the Commonwealth of Virginia. Custer is being sued in his individual capacity.

15.     Defendant John Cielakie ("Cielakie") is a Special Agent for ABC operating out of 900 Natural Resources Dr. #700, Charlottesville, VA 22903. On information and belief, Cielakie is a citizen of the Commonwealth of Virginia. Cielakie is being sued in his individual capacity.

- 3 -

## FACTUAL BACKGROUND

### The Events of March 17-18, 2015

16.     On the night of March 17, 2015, St. Patrick's Day, Martese and a friend from the University of Virginia decided to leave campus and head to an area of restaurants, bars, and shopping adjacent to the University known as "the Corner."

17.     That night, ABC agents had positioned themselves in strategic locations around the Corner, anticipating numerous violations of Virginia's alcohol laws based on the many St. Patrick's Day celebrations that were taking place.

18.     After leaving campus, Martese and his friend decided to go to Trinity Irish Pub ("Trinity").

19.     In Virginia, persons under the age of twenty-one are permitted to enter bars, and both bars and restaurants on the Corner routinely allow such individuals to enter after presenting a valid form of identification.

20.     To get into Trinity, Martese and his friend waited in a line spanning approximately half of a block.  When they reached the front of the line, Martese presented his valid identification card to the owner, who asked Martese to recite his zip code.  Because Martese had recently moved, he confused his current and former zip codes and inadvertently provided a zip code different than that on his identification.

21.     Martese was denied entry to Trinity because he provided the wrong zip code.

22.     At no point did Martese show any signs of intoxication.

23.     Martese and the owner of Trinity subsequently spoke for a few minutes about Kenwood Academy in Chicago, where Martese went to high school, as the owner was also from Chicago.

- 4 -

24.     Unbeknownst to Martese, ABC Agents Miller, Custer, and Cielakie had been surveilling Trinity and watched this exchange between Martese and the Owner.

25.     None of the Agents could hear the conversations that occurred while Martese was at Trinity.  As such, they did not know why Martese was denied entry to the bar.

26.     The three Agents did not see any signs of intoxication while surveilling Martese; nor did the Agents witness Martese conduct himself in a belligerent manner as Martese turned to walk away from Trinity.

27.     The Agents merely witnessed an individual cordially hand his identification to the bouncers at Trinity, the bouncers cordially return that identification to the individual, and the individual having a cordial conversation with the owner before beginning to walk away.

28.     Nevertheless, as Martese began to walk away, Agent Miller approached Martese from behind and grabbed his arm.  Miller did not identify himself as law enforcement or otherwise attempt to introduce himself to Martese before grabbing his arm.

29.     Miller approached Martese from behind and in such a way as to obscure the fact that he was law enforcement.

30.     Miller did not stop to speak to the owner or any other bouncers at Trinity before grabbing Martese.  Nor did he otherwise learn why Martese had been denied entry from Trinity.

31.     Due to the manner in which Miller approached Martese, Martese did not see Miller before Miller grabbed his arm.  Nor did Martese realize that Miller was law enforcement. Martese, startled from being grabbed from behind by someone he did not know, instinctively pulled his arm away and tried to continue walking.

32.     Miller followed him and again grabbed his arm, holding his elbow.  For the first time, Miller demanded to see Martese's "fake" identification card, while aggressively attempting

- 5 -

to twist Martese's arm behind his back.  Miller still had not identified himself as law enforcement.

33.     Miller immediately proceeded to this escalated and unnecessary use of force without first attempting to speak with Martese and without using any de-escalation procedures that might have been applicable to the situation.  Further, Miller did not order Martese to stop or give any other verbal indication that Martese was not free to leave.

34.     At or around this point in what was already becoming a brutal and callous encounter, Martese saw the officer's badge and realized that he was a member of law enforcement.  Miller had still not identified himself as an ABC agent; nor had he verbally ordered Martese to stop.

35.     Martese then attempted to cooperate with Agent Miller.  He began speaking with Miller so as to explain to the Agent that he had done nothing wrong and did not possess a fake identification card.  Martese also attempted to free himself from Miller's grasp to reach for his identification card in order to comply with Miller's order and to prove his innocence.

36.     While this was occurring, ABC Agent Custer, watching this exchange, approached Martese and Miller.  Custer grabbed Martese's left arm, effectively restraining him and preventing him from complying with Miller's order.  Martese did not see Custer approach. Nor did Custer identify himself as law enforcement before grabbing Martese's left arm.

37.     Martese was not yelling, did not appear intoxicated, and was not aggressive towards the Agents.  Instead, he attempted to cooperate with the agents, comply with their orders, and explain the situation to them.

38.     Moreover, Martese was not armed, and the Agents did not suspect him of being armed.

- 6 -

39.     Despite the Agents' lack of reasonable suspicion, failure to interview relevant witnesses, and brief conversation with Martese, the Agents appeared convinced that Martese had presented a false means of identification at the door of Trinity.  The agents were incorrect and had no basis for their preconceived misconception and ensuing detention of Martese.

40.     As Martese continued to try to reach his identification card and to explain the situation to the Agents, all of a sudden, and without provocation, Custer and Miller slammed Martese into the brick walkway, face first, causing Martese to suffer a severe laceration to his forehead and scalp.

41.     Martese had blood streaming down his face.

42.     After slamming him to the ground, Custer roughly and aggressively handcuffed Martese's left hand, while Custer and Miller continued to pin Martese to the ground, despite his compliance.

43.      Martese, who had been rendered effectively helpless and barely able to move due to his injuries and the two agents roughly restraining him, was writhing in pain.

44.     At the time Miller approached Martese, ABC Agent Cielakie took up position by the front door of Trinity.

45.     In that position, he was in close proximity to Miller, Custer, and Martese. Cielakie had clear line of sight to the group and, on information and belief, heard their conversation.

46.     On information and belief, Cielakie witnessed the entire unconstitutional detention and excessive use of force against Martese by Agents Miller and Custer.  Yet despite his proximity to and observation of the other Agents' unprovoked, violent, and unnecessary actions, he did nothing to intervene or to try and prevent them from injuring Martese.

- 7 -

47.　To the contrary, ABC Agent Cielakie joined Custer and Miller, and roughly and aggressively handcuffed Martese's right hand with a second set of handcuffs and connected the two pairs behind Martese's back.

48.　In pain and in shock, with blood streaming down his face and Miller and Custer on his back, Martese kept repeating to the officers "I go to UVa" in a desperate attempt to identify himself.

49.　Cielakie then unnecessarily shackled Martese's legs together without sufficient provocation.

50.　The Agents placed Martese under arrest. He was not Mirandized.

51.　Martese was transported to the hospital by ambulance.

52.　After receiving treatment, Martese received ten stitches to his forehead and scalp. He also sustained several smaller lacerations, facial swelling, and bruising along his torso and arms.

53.　Meanwhile, Miller obtained a warrant for obstruction of justice and public intoxication. The public intoxication charge was based on illegally obtained statements that occurred after Martese had already been arrested.

54.　At approximately 4:21 a.m., Martese was taken to the Albemarle County Regional Jail to appear before a magistrate judge on the two charges.

55.　Martese arrived at the Jail at approximately 4:32 a.m. He was made to undergo an inmate medical screening and was administered a preliminary breath test at some point between 4:30 and 5:00 a.m.

56.　On Thursday, June 11, 2015, both charges were dismissed by the Commonwealth Attorney of the City of Charlottesville, Virginia.

- 8 -

57.     The Agents' brutal and unjustified attack on Martese has left Martese permanently disfigured as there is scarring to Martese's forehead and scalp. Moreover, due to scar tissue on Martese's scalp, there are areas on which hair will no longer grow.

58.     Due to the effects of the Agents' unjustified attack, Martese missed multiple weeks of course instruction and was forced to withdraw from a class which set him back academically in comparison to other candidates for graduation in May 2016.

**ABC's and Director Walker's Failure to Supervise or Train**

59.     ABC agents have a history of aggressive, excessive, and unjustified behavior in effectuating their duties. This history stems from and is caused by a systemic failure to train and supervise agents by Defendants ABC and Director Walker.

60.     ABC's numerous failures to properly train and supervise its agents are highlighted by an incident in April 2013 also involving University of Virginia students. There, ABC agents, including Cielakie, swarmed the car of twenty-year-old Elizabeth Daly and slammed on her windows using steel flashlights and punched her windshield, mistaking the case of water she was carrying for a case of beer.

61.     Like Martese, Daly was arrested and spent several hours in jail. The charges against Daly were also dropped by the Commonwealth Attorney of the City of Charlottesville, Virginia.

62.     Based on the Daly incident, and others that Plaintiff believes to have occurred, ABC and Walker had specific knowledge of the policy, custom, or widespread practice of ABC officers' use of unreasonable, disproportionate, and wrongful force and tactics in approaching suspects believed to have committed minor infractions or non-violent offenses.

63.     Other law enforcement agencies have reacted to ABC's heavy-handed tactics by

- 9 -

reducing its access and participation in joint operations.

64. ABC and Walker have failed to act appropriately to change this policy, custom, or widespread practice of ABC officers' use of unreasonable, disproportionate, and wrongful force and tactics in approaching citizens. To the contrary, their policies, discussions, and advancement decisions, have perpetuated, reinforced, and sanctioned such practices.

## Count I
### False Arrest (42 U.S.C. §1983)
### Defendants Miller, Custer, and Cielakie

65. Plaintiff incorporates by reference and re-alleges each allegation set forth above.

66. Under 42 U.S.C. §1983:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress

67. The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures shall not be violated." U.S. Const. Amend. 4.

68. The Fourth Amendment is applicable to the Commonwealth of Virginia under the Fourteenth Amendment.

69. The Agents unreasonably seized Martese, and did so within their official capacity as law enforcement officers, under color of state law, acting within the ordinary course and scope of their employment, without a judicial warrant and without probable cause.

70. The Agents performed no investigation as to whether Martese possessed a valid means of identification before seizing him, and a reasonable officer in Miller's, Custer's, and

- 10 -

Cielakie's position would have realized that under applicable law, there was no reason, probable cause, or reasonably articulable suspicion to believe Martese violated any law of the Commonwealth of Virginia.

71.     The Agents' arrest of Martese without probable cause meaningfully interfered with Martese's right to be "secure in [his] effects" under the Fourth Amendment, thereby constituting a seizure.

72.     The Agents' warrantless seizure of Martese was objectively unreasonable and disproportionate.  Martese did not pose a physical threat or any imminent danger to any of the Agents, the public, or himself.

73.     Martese's pulling his arm away from Miller, after Miller approached him from behind and grabbed his arm without identifying himself as law enforcement, was not objectively unreasonable and posed no physical threat to Miller.  Rather Martese's action was justified, especially given that the manner in which Miller approached Martese prevented him from realizing that Miller was law enforcement.

74.     Under such circumstances, Martese's instinctive act of pulling his arm away was not dangerous and any objectively reasonable officer should have recognized such.

75.     The Agents also unreasonably ignored other non-physical options to request Martese's identification card, such as doing so by first identifying themselves and requesting it without any physical contact.

76.     Moreover, the Agents, by restraining both of Martese's arms, effectively prevented Martese from complying with their order to show them his identification.

77.     The Agents' seizure of Martese, without probable cause, when Martese was acting in an objectively reasonable manner, involved reckless and callous disregard for Martese's

- 11 -

constitutional rights and failed to promote and protect the public trust.

78.     In addition, Agent Cielakie remained in close proximity to the other Agents and Martese during their unconstitutional seizure of Martese with clear line of sight and within range of their conversation.  On information and belief, Cielakie witnessed the Agents seizing Martese without probable cause in circumstances in which any reasonable officer would have realized that the Agents did not have probable cause to effect the arrest.

79.     Based on Cielakie's observation of Agents Miller's and Custer's arrest of Martese, combined with his knowledge of the Agents' failure to investigate the situation and Martese's attempts to explain his actions and to show the officers his valid identification, Cielakie knew that his fellow agents were violating Martese's constitutional rights by seizing him without probable cause.

80.     Given Cielakie's close proximity to Martese and view of the entire encounter, Cielakie had a reasonable opportunity to prevent Martese's unconstitutional arrest and the harm that resulted.

81.     Yet Cielakie chose not to act while Agents Custer and Miller effected an unlawful and unconstitutional arrest of Martese.  To the contrary, after witnessing their actions, Cielakie chose to roughly and aggressively handcuff Martese and shackle his legs.

82.     Agent Cielakie's actions in witnessing Agents Miller's and Custer's unconstitutional seizure of Martese but choosing not to act to prevent it, separately renders Cielakie liable  based on bystander liability under 42 U.S.C. § 1983.

83.     As a direct and proximate result of the Agents' conduct, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Agents' actions, all attributable to the deprivation of

- 12 -

his constitutional rights guaranteed by the Fourth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of Defendants Miller, Custer, and Cielakie in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate.

**Count II**
**Excessive Force (42 U.S.C. §1983)**
**Defendants Miller, Custer, and Cielakie**

84.    Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

85.    The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures shall not be violated."  U.S. Const. Amend. 4.

86.    The Fourth Amendment's protections apply to use of excessive force by law enforcement officials against a free citizen.  *Graham v. Connor*, 490 U.S. 386, 394 (1989).

87.    The Fourth Amendment is applicable to the Commonwealth of Virginia under the Fourteenth Amendment.

88.    The Agents unreasonably used excessive force against Martese when:

a.    Miller grabbed Martese from behind without provocation, identification, or use of any other less intrusive means as Martese was walking away from Trinity;

b.    Miller again grabbed Martese's right arm at the elbow without provocation, identification, or use of any other less intrusive means and attempted to bend it

- 13 -

behind Martese's back;

c. Custer grabbed Martese's left arm without provocation, identification, or use of any other less intrusive means;

d. Custer and Miller slammed Martese to the brick walkway, face first, without provocation or use of any other less severe means, causing Martese to suffer a severe laceration to his forehead and scalp;

e. After slamming him to the ground, Custer roughly used excessive force when he handcuffed Martese's left hand, while Custer and Miller continued to pin Martese to the ground;

f. Cielakie roughly used excessive force when he handcuffed Martese's right hand; and

g. Cielakie unnecessarily shackled Martese's legs together without sufficient provocation.

89. Agents Miller's, Custer's, and Cielakie's use of force against Martese was objectively unreasonable from the first time Miller approached Martese until Martese was lying on the ground, with blood streaming down his face, his hands cuffed, and legs shackled.

90. Prior to his unlawful arrest, Martese was not verbally or physically aggressive towards the agents. Nor did Martese show any signs of intoxication.

91. No objectively reasonable officer would believe he was in physical danger from Martese.

92. The interaction between Martese and the owner of Trinity, which Miller allegedly witnessed, was friendly and polite. Martese was not hostile, aggressive, or at all violent in that interaction.

- 14 -

93. Moreover, the "crime" about which Miller ostensibly wanted to question Martese, possession of a fake identification card, is a non-violent misdemeanor offense. Likewise, Martese was neither armed nor suspected of being armed.

94. Martese was also not attempting to flee. Rather, Martese was simply trying to cooperate with the Agents, comply with their orders, explain the situation to them, and free his arms so he could reach in his pocket to prove his identity.

95. The Agents' use of excessive force on Martese, causing a severe gash on his forehead and scalp which required ten stitches, involved reckless and callous disregard for Martese's constitutional rights.

96. In addition, Agent Cielakie remained in close proximity to the other Agents and Martese during their unconstitutional and excessive uses of force against him, with clear line of sight and within range of their conversation. On information and belief, Cielakie witnessed the Agents' excessive use of force against Martese in circumstances in which any reasonable officer would have realized that the Agents' use of force was unconstitutional and objectively unreasonable.

97. Based on Cielakie's observation of Agents Miller's and Custer's numerous uses of force against Martese without provocation, as well as the Agents' immediate escalation to the use of force, their failure to identify themselves as law enforcement, their investigation of a non-violent misdemeanor, and their refusal to allow Martese to cooperate with their demands, Cielakie knew that his fellow agents were violating Martese's constitutional rights.

98. Given Cielakie's close proximity to Martese and view of the entire encounter, Cielakie had a reasonable opportunity to prevent the Agents' unconstitutional use of force and the harm that resulted.

- 15 -

99. Yet Cielakie chose not to act while Agents Custer and Miller brutally and unjustifiably slammed Martese to the ground. To the contrary, after witnessing their actions, Cielakie chose to roughly and aggressively handcuff Martese and shackle his legs.

100. Agent Cielakie's actions in witnessing Agents Miller's and Custer's unconstitutional uses of force but choosing not to act to prevent them, separately renders Cielakie liable based on bystander liability under 42 U.S.C. § 1983.

101. As a direct and proximate result of the Agents' conduct, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Agents' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of Defendants Miller, Custer, and Cielakie in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate.

### COUNT III
### Failure to Train or Supervise (42 U.S.C. §1983 *Monell* Claim)
### Defendants Department of Alcoholic Beverage Control and
### Defendant Shawn P. Walker

102. Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

103. At all material times, Defendants Miller, Custer, and Cielakie were acting under the color of state law as Agents for ABC.

104. Agents of ABC have a history of aggressive, excessive, and unjustified behavior

- 16 -

in effectuating their duties.  This history stems from and is caused by a systemic failure to train and supervise agents by Defendants ABC and Walker, including, but not limited to, failures to:

a.  train agents to properly and readily identify themselves as law enforcement officers;

b.  train agents to properly approach suspects on foot;

c.  train agents to appropriately and proportionally respond to any suspected violation or threat;

d.  train agents to employ an appropriate and proportionate level of force, given the type of charge alleged and the apparent threat (if any) to the agents at the scene; and

e.  train agents how to recognize and react to situations that might require de-escalation or disengagement.

105.   ABC's numerous failures to properly train its agents are further highlighted by an incident in April 2013 also involving UVa students.  There, ABC Agents, including Cielakie, swarmed the car of twenty year old Elizabeth Daly and hammered on her windows using steel flashlights and punched her windshield, mistaking the case of water she was carrying for a case of beer.

106.   Like Martese, Daly was arrested and spent several hours in jail.  The charges against Daly were also dropped by the Commonwealth's Attorney for the City of Charlottesville, Virginia.

107.   Based on the Daly incident, and others that Plaintiff believes to have occurred, ABC and Walker had specific knowledge of the policy, custom, or widespread practice of ABC Agents' use of unreasonable, disproportionate, and wrongful force and tactics in approaching

- 17 -

suspects.

108. ABC and Walker failed to change this policy, custom, or widespread practice of ABC officers' use of unreasonable, disproportionate, and wrongful force and tactics in approaching suspects, but instead, through their policies, discussions, and advancement decisions, perpetuated, reinforced, and sanctioned such practices.

109. Moreover, the Agents' brutal and unlawful actions against Martese on March 18, 2015 plainly demonstrate that:

    a. At all material times, ABC failed to train its agents to properly and readily identify themselves as law enforcement officers.

    b. At all material times, ABC failed to train its agents to properly approach suspects on foot.

    c. At all material times, ABC failed to train its agents to appropriately and proportionally respond to any suspected violation or threat.

    d. At all material times, ABC failed to train its agents not to employ tremendous physical force against a suspect and slam a suspect to the ground, face first, where the underlying charge is solely for possession of a fake identification card and there is no immediate threat to the agents or the community.

    e. At all material times, ABC failed to train its agents how to recognize and react to situations that might require de-escalation or disengagement.

110. The foreseeable result of ABC's and Walker's failures is that ABC agents, like Miller, Custer, and Cielakie, are more likely to unlawfully deprive citizens of "the right . . . to be secure in their persons" in a manner that constitutes an unlawful seizure and use of excessive force under the Fourth Amendment.

- 18 -

111.    By failing to supervise and train ABC agents, Defendants ABC and Walker directly or indirectly, and under color of law, allowed and ratified the policy, custom, or widespread practices discussed above.

112.    ABC's and Walker's failures were the moving force behind Miller's, Custer's, and Cielakie's, wrongful, negligent and/or reckless seizure and assault on Martese.

113.    ABC's and Walker's actions in allowing an arrest and use of brutal force without a warrant and without probable cause was objectively unreasonable and disproportionate because the arrest and assault of Martese could have been prevented with proper training and supervision of the Agents.

114.    ABC's and Walker's failures exhibit a deliberate indifference and callous disregard for Martese's constitutional rights, as well as other citizens of the Commonwealth of Virginia.

115.    As a direct and proximate result of ABC's failures, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Agents' actions, all attributable to the deprivation of his constitutional rights guaranteed by the Fourth Amendment of the U.S. Constitution and protected under 42 U.S.C. §1983.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of Defendants ABC and Walker in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate

- 19 -

## Count IV
## Gross Negligence
## Defendants Miller, Custer, and Cielakie

116.     Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

117.     Before and at the time Martese was arrested, the Agents owed a duty of care to Martese to respect Martese's right to be secure in his own person, to use the care and skill as is ordinarily possessed by objective members of law enforcement, to have a reasonable and objective understanding as is possessed by other members of law enforcement regarding appropriate behavior when approaching and questioning a free citizen, to use non-physical measures to handle minor and non-violent situations, and to use only a reasonable amount of force objectively necessary to respond to a situation involving a person suspected of possessing a fake identification card.

118.     The Agents, each of them and as detailed above, breached this duty and, in doing so, showed an utter disregard of prudence amounting to a complete neglect of Martese's safety and Constitutional rights, when they willfully, knowingly, wrongfully, and/or recklessly assaulted Martese without any reasonable justification or provocation and unreasonably ignored other non-physical and/or non-violent options to ascertain whether Martese possessed or had used a fake identification card.

119.     The Agents' actions involved a reckless or callous disregard for the duty they owed to Martese and showed the absence of slight diligence or the want of even scant care.  In fact, the Agents failed to investigate the situation, failed to identify themselves as law enforcement, and refused to allow Martese to cooperate with them or to explain that he had done nothing wrong.  The Agents' brutal and unjustified assault of Martese amounted to gross

- 20 -

negligence.

120. As a direct and proximate result of the Agents' gross negligence, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Agents' actions.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of Defendants Miller, Custer, and Cielakie in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate.

**Count V**
**Negligent Supervision and Training**
**Defendant Shawn P. Walker**

121. Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

122. Upon information and belief, other jurisdictions which use separate law enforcement officials to enforce the state's alcohol laws provide formal training and proper supervision for such officials on the appropriate manner to approach a non-violent suspect and the appropriate use of force, if any. These trainings demonstrate the degree of care and skill reasonably expected of law enforcement agencies whose officers will be dealing with situations involving suspected illegal activity and suspects who may be intoxicated.

123. Walker had knowledge of previous incidents of excessive use of force by its agents in non-violent situations.

124. Before and at the time of Martese's assault, Walker owed a duty to Martese to employ a reasonable amount of care and skill as is ordinarily possessed by the director of a

- 21 -

liquor control enforcement body in formally and regularly supervising and training such agents in appropriately handling such situations and the appropriate use of force.

125.    Walker breached this duty by failing to have proper supervision and training in place for handling non-violent situations and questioning suspects.

126.    Indeed, despite his knowledge of the policy, custom, or widespread practice of ABC Agents' use of unreasonable, disproportionate, and wrongful force and tactics in approaching suspects, as described above, Walker, through his policies, discussions, and advancement decisions, perpetuated, reinforced, and sanctioned such practices.

127.    Walker's failure to employ proper supervision and training, despite previous instances of ABC agents acting unlawfully and using excessive force, showed a reckless disregard for the safety and well-being of both Martese and the citizens of the Commonwealth.

128.    As a direct and proximate result of Walker's negligence, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Agents' actions.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendant Walker in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate

**Count VI**
**Assault**
**Defendants Miller, Custer, and Cielakie**

129.    Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

130.    On March 18, 2015, at approximately 12:45 a.m., Martese was lawfully walking

- 22 -

on University Avenue towards Emmett Street in Charlottesville, Virginia.

131.    The Agents, each of them, acting within the course and scope of their employment with ABC, placed Martese in reasonable apprehension of bodily harm and/or harmful and/or offensive and unpermitted contact with Martese's person when:

a.    Miller approached and grabbed Martese from behind as Martese was walking away from Trinity;

b.    Miller again grabbed Martese's right arm at the elbow and attempted to bend it behind Martese's back;

c.    Custer grabbed Martese's left arm;

d.    Custer and Miller slammed Martese to the brick walkway, face first, causing Martese to suffer a severe laceration to his forehead and scalp;

e.    After slamming him to the ground, Custer roughly and aggressively handcuffed Martese's left hand, while Custer and Miller continued to pin Martese to the ground;

f.     Cielakie roughly and aggressively handcuffed Martese's right hand; and

g.    Cielakie unnecessarily shackled Martese's legs together without sufficient provocation.

132.    The Agents were without probable cause or reasonable suspicion to believe Martese had committed a crime at the time they took the above-described actions.

133.    The Agents' unlawful, intentional, and or/grossly negligent actions placed Martese in reasonable apprehension of bodily harm and/or harmful and/or offensive and unpermitted contact with Martese's person and, in fact, resulted in such harmful, offensive, and unpermitted contact.

134.    As a direct and proximate result of the Agents' unlawful, intentional, and/or

- 23 -

grossly negligent actions, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of Miller's actions.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants Miller, Custer, and Cielakie in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate.

**Count VII**
**Battery**
**Defendants Miller, Custer, and Cielakie**

135.    Plaintiff hereby incorporates the allegations in the preceding paragraphs as if fully set forth herein.

136.    The Agents, each of them, imposed unwanted, unexcused, and unjustified bodily contact on Martese when:

a.  Miller grabbed Martese from behind as Martese was walking away from Trinity;

b.  Miller again grabbed Martese's right arm at the elbow and attempted to bend it behind Martese's back;

c.  Custer grabbed Martese's left arm;

d.  Custer and Miller slammed Martese to the brick walkway, face first, causing Martese to suffer a severe laceration to his forehead and scalp;

e.  After slamming him to the ground, Custer roughly and aggressively handcuffed Martese's left hand, while Custer and Miller continued to pin Martese to the ground;

- 24 -

f.   Cielakie roughly and aggressively handcuffed Martese's right hand; and

g.   Cielakie unnecessarily shackled Martese's legs together without sufficient provocation.

137.   Each of these unpermitted physical contacts caused Martese physical pain.

138.   Each one of the above-described acts of physical contact was objectively unreasonable and offensive.

139.   More, the above-described acts of physical contact caused Martese significant physical injury, including lacerations to his forehead and scalp which required ten stitches.

140.   The lacerations caused by the Agents' brutal battery of Martese have caused Martese to suffer disfigurement as there is permanent scarring to Martese's forehead and scalp. Moreover, due to scar tissue on Martese's scalp, there are areas on which hair will no longer grow.

141.   As a direct and proximate result of the Agents' unlawful, intentional, and/or grossly negligent actions, Martese has been injured in various respects, including, without limitation, suffering physical injuries and severe mental anguish due to the egregious nature of the Agents' actions.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in his favor and against each of Defendants Miller, Custer, and Cielakie in the amount of approximately $3,000,000.00, or in such greater amount to be determined at trial, costs, pre-judgment interest, attorneys' fees, punitive damages and grant such other and further relief that the Court may deem appropriate.

## **JURY DEMAND**

Plaintiff requests a jury trial of all issues so triable.

203358203.4

Dated: February 1, 2016

By:  s/ Benjamin G. Chew
     _____
     Benjamin G. Chew (VSB #29113)
     Joshua N. Drian (VSB #82061)
     Diana L. Eisner (admitted *pro hac vice*)
     Attorney for Plaintiff
     MANATT, PHELPS & PHILLIPS, LLP
     1050 Connecticut Avenue, N.W., Suite 600
     Washington, DC  20036
     Telephone: (202) 585-6500
     Fax: (202) 585-6600
     [Email:  BChew@manatt.com]
     [Email:  JDrian@manatt.com]
     [Email:  DEisner@manatt.com]

John S. Davis (VSB #72420)
Charles E. James (VSB #46310)
Daniel Watkins (VSB #84592)
WILLIAMS MULLEN
Attorney for Plaintiff
200 South 10th Street, Suite 1600
P.O. Box 1320 (23218-1320)
Richmond, Virginia 23219
Telephone: (804) 420-6045
Fax: (804) 420-6507
[Email:  dwatkins@williamsmullen.com]

*Counsel for Plaintiff Martese Johnson*

- 26 -

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February, 2016, a true and correct copy of the

foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which

will then send a notification of such filing (NEF) to the following counsel of record:

Nicholas F. Simopoulos
General Civil and Trial Unit Manager
Assistant Attorney General
Office of the Virginia Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-8199
Facsimile: (804) 371-2087
Email: nsimopoulos@oag.state.va.us

s/ _____
Benjamin G. Chew (VSB #29113)
MANATT, PHELPS & PHILLIPS LLP
1050 Connecticut Avenue, Suite 600
Washington D.C. 20036
Telephone: (202) 585-6511
Facsimile: (202) 637-1522
Email: BChew@manatt.com

203358203.4