# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Charlottesville Division

| | | |
|---|---|---|
| MARTESE JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Case No. 3:15-cv-00055-GEC |
| | ) | |
| VIRGINIA DEPARTMENT OF | ) | |
| ALCOHOLIC BEVERAGE | ) | |
| CONTROL, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

_____

## DEFENDANTS' BRIEF IN SUPPORT OF
## MOTION TO DISMISS FIRST AMENDED COMPLAINT

The defendants, the Virginia Department of Alcoholic Beverage Control, Shawn Walker, John Cielakie, Thomas Custer, and Jared Miller, by counsel, submit this Brief in Support of Motion to Dismiss First Amended Complaint, pursuant to this Court's May 16, 2016 Order (Dkt. No. 47). For the reasons that follow, this Court should dismiss with prejudice the plaintiff's First Amended Complaint ("FAC") (Dkt. No. 38) and all claims alleged against the defendants.

## I.      BACKGROUND

### A.      Factual Allegations from the First Amended Complaint[1]

On March 18, 2015, at around 12:45 a.m., the plaintiff, Martese Johnson, and his friend were standing in a line a "half of a block" long trying to gain entry to Trinity Irish Pub ("Trinity"). (FAC ¶¶ 1, 18, 20, 130.) Trinity is a pub located on the "Corner," which is an area adjacent to the University of Virginia campus. (*Id.* ¶¶ 16, 18.) The Corner consists of "bars and

---

[1] The facts cited herein are only those facts which the FAC alleges. The defendants otherwise do not admit to and dispute the accuracy, completeness, and sequence of those facts.

1

restaurants" as well.  (*Id.* ¶ 16.)  Allegedly, crowded St. Patrick's Day celebrations were taking place, and the plaintiff was underage.  (*Id.* ¶¶ 10, 17, 20.)

In light of the crowd and celebrations, law enforcement officers of the Virginia Department of Alcoholic Beverage Control ("ABC"), namely Jared Miller ("Agent Miller"), Thomas Custer ("Agent Custer"), and John Cielakie ("Agent Cielakie"), were present and had "positioned themselves in strategic locations" on the Corner.  (FAC ¶ 17.)  They were allegedly "anticipating" violations of Virginia's alcohol laws.  (*Id.*)  ABC, according to the FAC, is an "agency" which, in part, is "tasked with . . . enforcing the laws of the Commonwealth pertaining to alcoholic beverages."  (*Id.* ¶ 11.)

Once the plaintiff reached the entrance of Trinity, he presented an identification card to the owner.  (FAC ¶ 20.)  The FAC does not allege that Trinity permitted underage persons to enter at the time.  Rather, it generally concludes that "[i]n Virginia, persons under the age of twenty-one are permitted to enter bars" and that "both bars and restaurants on the Corner routinely allow such individuals to enter *after presenting a valid form of identification*."  (*Id.* ¶ 19) (emphasis added.)  Agents Miller, Custer, and Cielakie (collectively "the Agents") allegedly observed the plaintiff present a card to the owner of Trinity, after which there was a brief verbal interaction with the plaintiff.  (*Id.* ¶¶ 23-24.)  The plaintiff alleges that the owner viewed the identification card and asked him to recite the zip code, which the "confused" plaintiff was unable to do correctly.  (*Id.* ¶¶ 20-21.)  The owner of the pub, thus, refused the plaintiff entry.  (*Id.* ¶ 21.)  The Agents observed this encounter and refusal.  (*Id.* ¶ 24.)  In fact, the Agents witnessed the plaintiff "hand his identification to the bouncers at Trinity, [and] the bouncers . . . return the identification to" him as he was denied entry.  (*Id.* ¶ 27.)

After being denied entry to Trinity, the plaintiff started to walk away. (FAC ¶¶ 26-27.) Displaying a visible law enforcement badge, Agent Miller followed the plaintiff. (*Id.* ¶¶ 28, 34.) The plaintiff does not allege that Agent Miller was in plainclothes, nor can he. The FAC admits that, having viewed the encounter at the door of Trinity, all of the Agents believed that the plaintiff possessed a false identification, which is a Class 1 misdemeanor, in violation of Virginia Code §§ 4.1-305 and 18.2-204.1. (*Id.* ¶ 2.)

Agent Miller soon caught up to the departing plaintiff and, because the plaintiff continued to walk away, took a hold of his arm. (FAC ¶¶ 28, 31.) Agent Miller and the plaintiff said nothing to one another upon this first contact. (*Id.*) The FAC claims that the plaintiff "did not see Miller before Miller grabbed his arm" yet he alleges that he "did not know" Agent Miller. (*Id.* ¶ 31.) Rather than stop, the plaintiff "pulled his arm away" and walked away. (*Id.*)

Given this response, Agent Miller followed the plaintiff and took his arm a second time. (FAC ¶ 32.) The plaintiff admits that by this point he had seen Agent Miller's badge and understood Agent Miller was a law enforcement officer. (*Id.* ¶ 34.) Agent Miller requested the false identification that he suspected the plaintiff possessed. (*Id.* ¶ 32.) At this time, the plaintiff claims he "attempted to cooperate with Agent Miller" and explain he did not possess a false identification. (*Id.* ¶ 35.) The FAC admits the plaintiff, who still had a free arm, "attempted to free himself," or the one restrained arm from Agent Miller's hold, to reach into his pocket for the identification "to prove his identity." (*Id.* ¶¶ 35, 94.)

Having observed this physical interaction, Agent Custer approached to assist. (FAC ¶ 36.) As with Agent Miller, the plaintiff does not allege, nor can he, that Agent Custer was in plainclothes. While Agent Miller was attempting to hold the plaintiff's elbow, and the plaintiff was attempting to "free" his restrained arm, Agent Custer took hold of the plaintiff's other arm.

(*Id.*)  The plaintiff allegedly did not see Agent Custer approach before taking his arm, but he also alleged he knew he was an agent, or law enforcement officer.  (*Id.* ¶¶ 36, 37.)  According to the FAC, Agent Custer also suspected that the plaintiff possessed a false identification.  (*Id.* ¶ 39.)

As Agents Custer and Miller attempted to hold the plaintiff's arms, the plaintiff allegedly "continued to try to reach for his identification" in his pocket and explain himself.  (FAC ¶¶ 40, 94.)  Again, the plaintiff made no statement to Agent Custer to indicate that his intent this third time was to "free himself" in order to reach into his pocket specifically for his identification.  Given the physical back-and-forth, the three men fell to the ground "all of a sudden," and the plaintiff's head hit the pavement.  (*Id.*)  The plaintiff feels that Agents Custer and Miller had "slammed" him down.  (*Id.*)  The plaintiff sustained a laceration to his head due to the fall, requiring stitches.  (*Id.* ¶¶ 40, 52.)

On the ground, Agents Custer and Miller attempted to handcuff the plaintiff's hands, while the plaintiff, claiming he was both "barely able to move" and "writhing," or twisting, around.[2]  (FAC ¶¶ 42-43.)  Agent Cielakie, who observed the three men on the ground, came over to assist.  (*Id.* ¶ 47.)  While Agents Custer and Miller tried to handcuff and restrain the twisting plaintiff, Agent Cielakie used a second pair of handcuffs to connect to the handcuffs that Agents Custer and Miller had already placed on the plaintiff's other hand.  (*Id.*)  Agent Cielakie restrained the plaintiff's ankles, while the plaintiff repeatedly stated, "I go to UVA."  (*Id.* ¶¶ 47-49.)  Agent Cielakie said nothing to the plaintiff, and the plaintiff said nothing else to Agent Cielakie.  The plaintiff was arrested and taken to the hospital for treatment.  (*Id.* ¶¶ 50-51.)

---

[2] While the plaintiff subjectively describes his movements as "writhing in pain," (FAC ¶ 43), objectively, the plaintiff was twisting his body from side-to-side.  That is, "to writhe" is defined as "to twist in pain," or "to twist from or as if from pain or struggling."  Merriam-Webster's Collegiate Dictionary 1367 (10th ed. 1997).  *See* Roget's II The New Thesaurus 1147 (3rd ed. 1995) (defining to "writhe" as to "twist and turn, as in pain, struggle, or embarrassment.")

The FAC alleges no acts of force after the completion of the arrest. Rather, medical treatment was promptly provided to the plaintiff. (FAC ¶¶ 50-52.) After he was provided treatment, Agent Miller obtained a warrant against the plaintiff for obstruction, which is a Class 1 misdemeanor under Va. Code § 18.2-460. (*Id.* ¶ 53.) Moreover, allegedly based on the plaintiff's "statements . . . after [he] had already been arrested," Agent Miller charged the plaintiff with public intoxication, in violation of Va. Code § 18.2-388.[3] (*Id.*)

The FAC contains no factual allegations against Shawn Walker ("Walker"). Walker was not present during the arrest. He worked in Richmond, not in Charlottesville where the arrest occurred. (FAC ¶ 12.) On June 12, 2015, the Charlottesville Commonwealth's Attorney *nolle prossed* the charges against the plaintiff. (*Id.* ¶ 5; "Virginia's Judicial System," www.courts.state.va.us, *Commonwealth v. Johnson*, GC15001650-00 (Charlottesville)).

### B.     Procedural Background

On October 20, 2015, the plaintiff filed his original Complaint (Dkt. No. 1) against ABC, Walker, and the Agents, asserting seven (7) claims arising from the March 18, 2015 arrest. The defendants filed their Motion to Dismiss (Dkt. No. 12), Brief in Support (Dkt. No. 13), and Reply Brief (Dkt. No. 24) (collectively "MTD"), seeking dismissal of the Complaint in its entirety for failure to state a claim upon which relief can be granted. After oral argument,[4] the Court reserved judgment on the MTD, and the plaintiff filed the FAC.

Against ABC and Walker, the FAC alleges, pursuant to 42 U.S.C. § 1983, a failure to train or supervise ("Count III") and a state law claim of negligent supervision and training against Walker ("Count V"). (FAC ¶¶ 102-115, 121-128.) Against the Agents, the FAC alleges

---

[3] The plaintiff does not disclose the statements to this Court.
[4] The defendants hereby incorporate the transcript from the hearing and reassert their arguments therein. (*See* Dkt. No. 41-1.)

a claim of false arrest and excessive force, pursuant to 42 U.S.C. § 1983 ("Count I" and "Count II"), and state law claims of gross negligence ("Count IV"), assault ("Count VI"), and battery ("Count VII"). (*Id.* ¶¶ 65-101, 116-20, 129-34, 135-41.) The plaintiff filed this action against Walker and the Agents in their individual capacities, demanding $3,000,000.00 in damages.

Given their position that the plaintiff exceeded the limited scope of leave to amend, the defendants filed a motion to strike. (Dkt. Nos. 39, 40.) On May 16, 2016, this Court entered an Order denying the motion, but providing the defendants twenty-one (21) days to file "additional memoranda in response to plaintiff's amended allegations." (Dkt. No. 47.) To promote accuracy and clarity, and to aid this Court with a single and complete document, the defendants file this Motion to Dismiss First Amended Complaint and Brief in Support as the "additional memoranda in response" and combine their previous and still applicable MTD arguments with the arguments on the plaintiff's new matters.

## II. ARGUMENT

This Court should grant this Motion to Dismiss and dismiss all claims with prejudice. The totality of the alleged facts and circumstances in the FAC demonstrate that reasonable suspicion and probable cause objectively existed to justify, respectively, the plaintiff's stop and arrest. The FAC also fails to allege objective facts and circumstances which support any federal or state law claim, whether cognizable, plausible, or sufficient.

The plaintiff has alleged Count III against ABC and Walker and Count V against Walker. Count III fails. Regarding ABC, ABC is entitled to Eleventh Amendment immunity because it is an agency of the Commonwealth of Virginia ("Commonwealth"). Moreover, ABC is not a "person" subject to an action under 42 U.S.C. § 1983. With respect to Walker, the FAC alleges no facts to state a plausible claim of failure to train or supervise under 42 U.S.C. § 1983. Walker

is also entitled to qualified immunity. Additionally, Count V fails to allege plausible state law claims of negligent supervision and training because Virginia law does not recognize these claims, and, irrespective, Walker is entitled to sovereign immunity.[5]

With respect to Counts I, II, IV, VI, and VII, the FAC fails to state a claim against the Agents. Viewed from the objective perspective of a reasonable officer, the totality of the alleged facts and circumstances show that the Agents possessed reasonable suspicion to stop the plaintiff for possession of a false identification, and that, based upon the plaintiff's subsequent conduct and resistance, probable cause to arrest him for, *inter alia*, obstruction. Because probable cause existed, the Agents did not violate the Fourth Amendment or otherwise act without legal justification. Finally, the Agents are entitled to qualified and sovereign immunity.

### A. Standard of review on a Rule 12(b)(6) motion to dismiss.

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12 (b)(6). "The function of a motion to dismiss for failure to state a claim is to test the legal sufficiency of the complaint." *Allen v. College of William & Mary*, 245 F. Supp. 2d 777, 783 (E.D. Va. 2003). Considering a complaint and its allegations in the light most favorable to the non-moving party, a court must grant a motion to dismiss if a plaintiff fails to plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff is required to state facts sufficient to "raise a right to relief above the speculative level," alleging a claim that is "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. "A claim has facial plausibility when the plaintiff pleads factual

---

[5] The plaintiff has withdrawn his Count V claim against ABC. (*See* Dkt. No. 23, p. 30 n.20.)

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Thus, for an action to survive dismissal for a failure to state a claim, a plaintiff must "allege facts sufficient to state all the elements of [his or] her claim." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citations omitted). If the well-pleaded facts do not permit a court to infer more than the mere possibility of misconduct, there has not been a showing that a plaintiff is entitled to relief. *Iqbal*, 556 U.S. at 678. "[N]aked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between *possibility* and *plausibility* of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quotations omitted) (emphasis added). In its inquiry, this Court need not consider a plaintiff's "unwarranted inferences, unreasonable conclusions, or arguments," *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 n.26 (4th Cir. 2009), or legal conclusions. *Estrella v. Wells Fargo Bank, N.A.*, 497 Fed. Appx. 361, 362 (4th Cir. 2012) (citing *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009)).

## B. The FAC fails to state a claim against ABC and Walker for failure to train or supervise under 42 U.S.C. § 1983 (Count III).

### 1. ABC is entitled to Eleventh Amendment immunity as a matter of law.

Notwithstanding the plaintiff's minimal allegations and legal conclusions, ABC is entitled to Eleventh Amendment immunity as matter of law. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Eleventh Amendment immunity protects not only the State but its agencies as well. *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 479 (4th Cir. 2005) (citing *Regents*

*of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997)); *see Caperton v. Va. Dep't of Transp.*, No. 3:15-cv-00036, 2015 U.S. Dist. LEXIS 145926 at *8 (W.D. Va. 2015) (Conrad, J.) (granting a Rule 12(b)(6) motion in a 42 U.S.C. § 1983 action and holding that the Commonwealth's Department of Transportation was entitled to Eleventh Amendment immunity). "The preeminent purpose of state sovereign immunity is to accord States [and their agencies] the dignity that is consistent with their statuses as sovereign entities." *Fed. Mar. Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 760 (2002) (alterations added). Importantly, "[t]he existence of sovereign immunity is a question of law." *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 332 (4th Cir. 2008) (citation omitted). And, in examining this legal question, this Court "'may properly take judicial notice of matters of public record,' including statutes." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, et al.*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

The Fourth Circuit has enunciated "four nonexclusive factors" to consider in analyzing whether an entity is an arm of the State for the purposes of Eleventh Amendment immunity. *See Oberg*, 745 F.3d at 136. The factors include: (1) whether, as a matter of "State law," a judgment against the entity will "be paid by," "binding" upon, or "enforced against the State;" (2) whether and to what extent the entity has "autonomy" from the State, including whether the State "appoints the entity's directors or officers, "funds the entity," or "retains a veto power" over the entity's actions, and whether the entity "has the ability to contract," "sue and be sued," and "purchase and sell property," and, last, whether the entity is "represented in legal matters by the state attorney general;" (3) whether the entity is involved in State concerns "as distinct from non-state concerns, including local concerns"; and (4) "how the entity is treated under state law, such as whether the entity's relationship with the State is sufficiently close to make the entity an arm

9

of the State," in light of, in part, state statutes and "holdings of [the state court] on the question." *Id.* at 136-38.

In *Oberg*, the Fourth Circuit granted a Rule 12(b)(6) motion to dismiss on behalf of the Arkansas Student Loan Authority ("ASLA"), holding that the ASLA was as an arm of the State under Arkansas statutory law and, thus, entitled to Eleventh Amendment immunity. 745 F.3d at 142-45. Regarding the first factor above, it observed that Arkansas had not explicitly, by statute, disavowed liability for the judgments against ASLA, indicating that Arkansas, not ASLA, was liable for them. *Id.* at 142-43. ASLA's revenues were also deemed by statute to be Arkansas revenues, indicating that ASLA had no liability for judgments. *Id.* at 143.

The Fourth Circuit then analyzed the second *Oberg* factor. It found that this factor weighed in ASLA's favor because Arkansas provided ASLA with substantial operational funding and Arkansas's attorney general represented it in legal matters. *Id.* at 144. Arkansas also limited ASLA's powers in various areas, including exercising control over its funds and requiring the Arkansas Governor and General Assembly's approval over various financial matters. *Id.*

The Fourth Circuit then determined that the third and fourth *Oberg* factors weighed in ASLA's favor. "Critically," the Governor appointed all members of ASLA's board of directors, showing a "key indicator of state control." *Id.* ASLA was also focused on the statewide concern of financing education for Arkansas residents, and Arkansas statutes and courts plainly treated ASLA as an "instrumentality of the state" and "state agency." *Id.* at 144-45. Given all of these findings, it held that, "Rule 12(b)(6) mandates dismissal." *Id.* at 145.

The issue of whether ABC is an agency of the Commonwealth for the purposes of the Eleventh Amendment is decided. The United States District Court for the Eastern District of

Virginia has held that ABC is an agency of the Commonwealth and entitled to Eleventh Amendment immunity. *Dance v. City of Richmond Police Dep't*, No. 3:09-cv-00423, 2009 U.S. Dist. LEXIS 80389 (E.D. Va. Sept. 2, 2009) (dismissing a 42 U.S.C. § 1983 action because ABC is an immune agency of the Commonwealth). In so holding, the district court reviewed the statutory scheme regulating ABC. *Id.* While this Court need not answer the question yet again here, reconsideration of ABC's statutory scheme under the *Oberg* analysis undeniably supports the *Dance* decision. Like in *Oberg*, "Rule 12(b)(6) mandates dismissal" here.

ABC is an "agency" charged with "enforcing the laws of the Commonwealth." (FAC ¶ 11). It is much more, however. "Through its [Alcoholic Beverage Control Act, or Virginia Code §§ 4.1-100, *et seq.* [the 'Act'], . . . Virginia regulates the distribution and sale of alcoholic beverages." *Brooks v. Vassar*, 462 F.3d 341, 345 (4th Cir. 2006). The Act evidences not only this regulatory authority but also the Commonwealth's absolute dominion over ABC.

Regarding the first *Oberg* factor, the Commonwealth, not ABC, is liable for ABC's judgments. Not a single provision in the Act "explicitly disavows" the Commonwealth's liability for ABC's debts or judgments. *See* Va. Code § 4.1-100, *et seq.*; *Oberg*, 745 F.3d at 138 (finding that an unrelated non-ASLA entity had failed to meet the first factor when, in part, its State explicitly disavowed liability by a statute which provided that "no obligation of the agency shall be a debt of the State.") Moreover, not a single provision in the Act states that ABC's debts are "not payable out of any moneys except those of the corporation."[6] *Oberg*, 745 F.3d at 138 (finding that a State's law codified this position).

---

[6] The non-ASLA entity in question, unlike ABC, had this problem and was also expressly created as "a body corporate and politic constituting a public corporation." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 654 (4th Cir. 2015). ABC, however, is not a corporation; it is a "Department" of the Commonwealth. Va. Code §§ 4.1-101, 8.01-195.2 (defining an "agency" under the Virginia Tort Claims Act to include "departments").

Additionally, the Act plainly shows that the Commonwealth, not ABC, exercises control and discretion over the moneys which ABC collects, and that ABC is required to account for and report its use of moneys to the Commonwealth. *See e.g.*, Va. Code § 4.1-116(A) (mandating that all moneys which ABC collects "shall be paid directly and promptly into the state treasury . . . without any deductions," that "[a]ll moneys so paid into the state treasury, less the net profits . . . shall be set aside as and constitute an Enterprise Fund, subject to appropriation"); *Id.* § 4.1-116(B) (directing that "the net profits . . . shall be transferred by the Comptroller to the general fund of the state treasury quarterly" and, "[a]s allowed by the Governor, the Board may deduct from the net profits quarterly a sum . . . not exceeding" a specified amount); *Id.* § 4.1-117 (requiring a major portion of ABC's "net profits" to be paid from the state treasury to the Commonwealth's cities, counties, and towns). Moreover, the Commonwealth's Department of State Police, not ABC's law enforcement, investigates ABC's handling of moneys. *Id.* § 4.1-103.1; *see also id.* § 4.1-105 (declaring that ABC's agents "are vested . . . with like power to enforce the provisions of . . . this title and the criminal laws of the Commonwealth"). Given the wealth of non-exclusive statutory authority above, the only conclusion that can result is that ABC is an arm of the Commonwealth.

The second *Oberg* factor also weighs in ABC's favor. The Commonwealth exercises a significant degree of control over ABC as a matter of law. Comprehensively defining and prescribing ABC's activities, the Commonwealth has created, controls the composition of, and appoints and removes all decision-makers of ABC. ABC was expressly created as "the Department of Alcoholic Beverage Control . . . [which] shall consist of the Virginia Alcoholic Beverage Control Board and the agents and employees of the Board." Va. Code § 4.1-101 (alteration added). As to composition, ABC must "consist of three members appointed by the

Governor, subject to confirmation by the General Assembly, for terms of five years each." *Id.*

§ 4.1-102. The Governor designates the chairman of ABC's Board, and he may also suspend or remove ABC's Board members. *Id.* Each ABC Board member is subject to impeachment proceedings pursuant to the Virginia constitution, must take an oath of office, and must pay a bond, which subject to approval by the Governor and Virginia's Attorney General. *Id.* As in *Dance* and here, the Virginia Attorney General's Office represents ABC in legal matters. *See also* Va. Code § 2.2-507(B)(1).

While a review of the provisions above is decisive, other provisions in the Act further demonstrate control by the Commonwealth over ABC. Significantly, ABC has no capacity to sue and be sued in its own name. Rather, ABC may sue and be sued only in the name of the Commonwealth. *See* Va. Code § 4.1-106 (directing that ABC may sue or be sued in any contract action only in the name of the Commonwealth and that "no such proceedings shall be taken against, or in the names of, the members of the Board"); *Id.* § 4.1-335 (directing that ABC may sue on a nuisance only in the name of Commonwealth). ABC may not purchase significant property on its own, but it must be done "with the consent of the Governor." *Id.* § 4.1-103(7). ABC must conduct itself in compliance with the Commonwealth's Administrative Process Act, or Va. Code §§ 2.2-4000, *et seq.*, which establishes a statutory procedure which all of the Commonwealth's agencies must follow to adjudicate matters and promulgate regulations. *Id.* § 4.1-103(13). Last, ABC is required to report its activities, submitting "reports to the Governor as he may require covering the administration and enforcement of this title." *Id.* § 4.1-115(A).

Finally, the third and fourth factors of *Oberg* fall squarely in favor of ABC. The Commonwealth is necessarily comprised only of its localities, including its cities, counties, and towns. So, while ABC addresses some local concerns, it addresses them throughout Virginia,

affecting Virginia residents. The Act does not limit ABC's authority to localities. *See* Va. Code § 4.1-103. ABC is authorized to address concerns throughout Virginia for Virginia residents, including but not limited to regulating the possession, sale, transportation, and delivery of alcoholic beverages. *See e.g.*, Va. Code §§ 4.1-103(3), 4.1-112, 4.1-118, 4.1-121 to -129, 4.1-132. Throughout Virginia, ABC administers and regulates licenses (Virginia Code §§ 4.1-200 to -240), enforces criminal laws (*Id.* §§ 4.1-300 to -354), and oversees Virginia's wine and beer franchise acts. *Id.* §§ 4.1-400 to -517. As to the government itself, ABC administers the "substance abuse prevention program within the Commonwealth" and coordinates "substance abuse prevention activities of agencies of the Commonwealth," reporting annually to "the Governor and the General Assembly." *Id.* § 4.1-103.02.

In light of the plain and unambiguous statutory scheme above, ABC is an agency and arm of the Commonwealth and is entitled to immunity under the Eleventh Amendment. And, resolution of this immunity question at this early stage is critical. As the Supreme Court of the United States has declared, "[t]he value to the States of their Eleventh Amendment immunity, like the benefit conferred by qualified immunity to individual officials, is for the most part lost as litigation proceeds past motions practice." *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 145 (1993). As a result, to allow the plaintiff to proceed any further against ABC, which is an agency of the Commonwealth, would undermine the essential purpose of immunity under the Eleventh Amendment and the dignity that the Supreme Court affords the Commonwealth. Therefore, this Court should dismiss this 42 U.S.C. § 1983 action against ABC.

### 2. ABC is also not a "person" subject to suit under 42 U.S.C. § 1983.

Similarly, as an agency of the Commonwealth, ABC is also not a "person" subject to suit under 42 U.S.C. § 1983, which provides in part:

14

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

(emphasis added.)  The Supreme Court has held that a State is not a "person" subject to an action under 42 U.S.C. § 1983 and, as such, is immune to such an action.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).  This immunity is extended to its agencies.  *See Taliaferro v. State Council of Higher Educ.*, 372 F. Supp. 1378, 1381 (E.D. Va. 1974) (holding that a State agency is not a "person" subject to an action under 42 U.S.C. § 1983); *see also Cross v. Commonwealth Dep't of Corr.*, No. 7:11-cv-00404, 2011 U.S. Dist. LEXIS 96798, at *4 (W.D. Va. 2011) (dismissing a 42 U.S.C. § 1983 action because the Department of Corrections is not a "person").  For this additional reason, this Court should dismiss Count III against ABC.

### 3.     Count III fails to state a plausible or sufficient claim of failure to train or supervise against Walker under 42 U.S.C. § 1983.

The FAC's insistence in attempting to allege a claim against Walker merely because he is a high-ranking member of ABC is meritless.  No basis exists to keep him in this action, and Count III's factual deficiencies confirm the same.  The plaintiff has alleged insufficient facts against Walker, and an alleged failure to train or supervise is wholly conclusory and speculative.

The Fourth Circuit has held that "supervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates."  *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984).  "Liability in this context," however, "is not premised on *respondeat superior,* but on a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care."  *Id.* (internal citations omitted).  As the Fourth Circuit has

cautioned, "[p]roving supervisory liability is a difficult task in § 1983 cases." *Hughes v. Halifax County Sch. Bd.*, 855 F.2d 183, 186 (4th Cir. 1989). Thus, a plaintiff "assumes a heavy burden of proof in supervisory liability cases." *Slakan*, 737 F.2d at 373.

Consequently, the Fourth Circuit has enunciated "three elements necessary to establish supervisory liability under § 1983: (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Shroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted).

The allegations against Walker fall far short of the difficult task of pleading supervisory liability. At the outset, Walker was not present during and had no personal involvement with the plaintiff's arrest. The FAC alleges no facts to link him to the arrest, save his employment with ABC. Walker is also alleged to work in Richmond at a location 68.9 miles away from Trinity. A nexus between Walker and the plaintiff's arrest is absent. Under 42 U.S.C. § 1983, the plaintiff cannot allege against Walker a claim which is, at its best, *respondeat superior*. *See e.g. Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (noting the doctrine of *respondeat superior* does not apply to 42 U.S.C. § 1983 claims).

Additionally, the FAC is devoid of factual content to meet the above elements of supervisory liability. First, the alleged facts and circumstances do not show that Walker had actual or constructive knowledge that the Agents were engaging in conduct on the Corner which

posed an unreasonable risk of constitutional injury. Second, the FAC alleges no facts to show a deliberately indifferent or other improper response on the part of Walker.

As to this second element, the FAC's lone citation to one prior and highly distinguishable incident which happened more than three years ago, or in April 2013, and which did not even involve all of the Agents, does not suffice to establish the requisite factual nexus to Walker. Nor does it show "continued inaction in the face of documented widespread abuses." *Slakan*, 737 F.2d at 373; *see Carter v. Morris,* 164 F.3d 215, 221 (4th Cir. 1999) (finding one prior incident insufficient for supervisory liability); *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980) (observing that "a single incident or isolated incidents" ordinarily do not suffice to show deliberate indifference or a widespread abuse); *Caldwell v. Green*, 451 F. Supp. 2d 811, 821 (W.D. Va. 2006) (stating a plaintiff cannot meet his burden by a single or isolated incident).

Naming Agent Cielakie, who allegedly was involved in the 2013 incident, as a defendant is a transparent and attenuated attempt to tie two isolated, unrelated, and drastically different incidents together. In fact, the allegations in the FAC show that Agent Cielakie did not even arrest the plaintiff, remained at the door of Trinity during the investigatory stop and arrest, and only assisted Agents Custer and Miller handcuff the plaintiff after the three men had "all of a sudden" fallen to the ground and were twisting around.

Finally, for these same reasons, the FAC also fails on the third element, or an affirmative causal link to Walker. Not a single affirmative act is alleged against Walker. Moreover, as set forth below, the FAC alleges no constitutional injury to the plaintiff for which Walker could be liable. Thus, Count III fails to state a claim against Walker and should be dismissed.[7]

---

[7] ABC has Eleventh Amendment immunity to this claim. Additionally, given the absence of allegations and reliance upon one drastically different and isolated incident, the plaintiff also fails to allege this claim on the substance against ABC.

### C. The FAC fails to state negligent supervision and training claims (Count V).

This Court should dismiss Count V against Walker because Virginia law does not recognize negligent supervision and training claims.[8] As to negligent supervision, the Supreme Court of Virginia has never recognized such a claim and, in fact, has even *declined* to do so on one occasion. *See Chesapeake & Potomac Tel. Co. v. Dowdy*, 235 Va. 55, 61 (1988) ("[i]n Virginia, there is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances and we will not create one here"). Virginia circuit courts have concluded the same. *See e.g., Gilbertson v. Purdham*, 78 Va. Cir. 295 (Roanoke 2009); *Stottlemyer v. Ghramm*, 60 Va. Cir. 474 (Winchester 2001). This Court has also not recognized the claim. *See Jones v. Kroger Ltd. P'ship*, 80 F. Supp. 3d 709, 714-15 (W.D. Va. 2015) (Conrad, J.) (dismissing the claim and stating that "this Court cannot create a duty to supervise where Virginia courts have not.").

Similarly, the Supreme Court has not recognized a negligent training claim. Numerous Virginia circuit courts from 1994 to 2010 also have not recognized the claim. *See e.g.*, *Garcia v. B & J Trucking, Inc.*, 80 Va. Cir. 633, (Sussex 2010); *Banach v. Benton,* 74 Va. Cir. 233 (Portsmouth 2007); *Gray v. Rhoads,* 55 Va. Cir. 362 (Charlottesville 2004); *Sippel v. MJS Corp*, 70 Va. Cir. 436 (Alexandria 2001); *Williams v. Dowell,* 34 Va. Cir. 240 (Richmond 1994). This Court's sister District has declared that it "will not recognize a Virginia cause of action for negligent training where such cause of action has not been clearly established." *Morgan v. Wal-Mart Stores East, LP*, No. 3:10-cv-669, 2010 U.S. Dist. LEXIS 116400 at *11 (E.D. Va. 2010); *see Al Shimari v. CACI Int'l, Inc.*, 951 F. Supp. 2d 857, 873 n.8 (E.D. Va. 2013) (granting a motion to dismiss because, in part, "negligent supervision and negligent training are not

---

[8] The plaintiff has withdrawn this claim against ABC. (*See* Dkt. No. 23, p. 30 n.20.)

recognized torts in Virginia.")  Given the consistent position of all of these courts, this Court should decline the plaintiff's invitation to create new Virginia law here.

### D.     The FAC fails to state a plausible claim for false arrest against the Agents under 42 U.S.C. § 1983 (Count I).

Count I fails to state a claim for false arrest against any of the Agents.  The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  However, "police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections."  *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 1983); *see Illinois v. Wardlow*, 528 U.S. 119, 123-26 (2000) (observing that law enforcement may approach an individual without probable cause when they suspect that criminal activity is afoot). Moreover, a "police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  *Terry v. Ohio*, 392 U.S. 1, 22 (1968).  That is, "[a] brief investigative stop is permissible when the investigating officers have a reasonable suspicion grounded in 'specific and articulable facts' that the person stopped is, is about to be, or has been involved in criminal activity."  *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir. 1988) (quoting *Terry*, 392 U.S. at 21).

During a stop, "[i]nvestigating officers may take such steps as are reasonably necessary to maintain the status quo . . . ."  *Taylor*, 857 F.2d at 213 (citing *United States v. Hensley*, 469 U.S. 221, 235 (1985)).  A police officer "is entitled to use force to effectuate a *Terry* stop." *United States v. Smith*, 386 F. App'x. 399, 403-04 (4th Cir. 2010) (citing *Graham v. Connor,* 490 U.S. 386 (1989) for the principle that "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to

effect it."). Finally, when reasonable suspicion exists, "the reasonableness of an officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." *United States v. Sokolow*, 490 U.S. 1, 11 (1989).

Additionally, to state a claim for *false arrest*, a plaintiff must show that the defendants arrested him without probable cause. *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *see Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996); *United States v. Al-Talib*, 55 F.3d 923, 931 (4th Cir. 1995). As the Fourth Circuit has explained, "[f]or probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required." *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002) (analyzing § 1983 false arrest claim under Fourth Amendment's unreasonable seizure framework); *see also Wong Sun v. United States*, 371 U.S. 471, 479 (1963). Thus, to claim an "absence of probable cause," a plaintiff "must allege a set of facts which made it *unjustifiable* for a reasonable officer to conclude that [the plaintiff] was violating" the law. *Brown*, 278 F.3d at 368 (alteration and emphasis added).

Ultimately, "the test is whether a police officer acting under the circumstances at issue reasonably *could have believed that he had probable cause* to arrest." *Sevigny v. Dicksey*, 846 F.2d 953, 956 (4th Cir. 1988) (emphasis added). As is apparent, this Court views "the totality of the circumstances from the perspective of a reasonable officer," not a plaintiff. *Tyree v. United States*, No. 3:09-cv-663, 2010 U.S. Dist. LEXIS 48198, at *13 (May 7, 2010), *aff'd*, 417 F. App'x. 364 (4th Cir. 2011); *see Gomez v. United States*, No. 97-1025, 1998 U.S. App. LEXIS 7707, at *8-9 (4th Cir. Apr. 20, 1998) (declaring that "[b]ecause probable cause is an objective test, we examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act"); *Guerrero v. Deane*,

750 F. Supp. 2d 631 (E.D. Va. 2010) (analyzing probable cause from the "perspective of a reasonable officer at the scene"). "Seemingly innocent activity, however, though not conclusive of probable cause, 'may provide the basis for a showing of probable cause' when considered in the context of all of the surrounding circumstances." *Taylor*, 81 F.3d at 434 (quotations omitted). Finally, in assessing probable cause, a court focuses upon the particular facts and circumstances of the case at bar. *See Ornelas v. United States*, 517 U.S. 690, 697-98 (1996).

1. **The FAC demonstrates the existence of probable cause to arrest the plaintiff for possession of false identification in violation of Va. Code §§ 4.1-305(B) and 18.2-204.1(B).**

The amended allegations in the FAC show that all three Agents had probable cause to arrest the plaintiff for possession of a false identification, which is a Class 1 misdemeanor. Thus, Count I fails to state a claim for false arrest, and this Court should dismiss it.

The plaintiff alleges in the FAC that he was rejected entry to the bar because he confused and was unable to accurately recite the zip code on the identification he presented to the owner of Trinity upon inquiry. (FAC ¶ 20). Significantly, the FAC alleges that all three Agents witnessed this exchange, observed the rejection and return of the identification to the plaintiff, and saw the plaintiff be denied entry and walk away. (*Id.* ¶¶ 24, 27.) At this moment, all three Agents could have justifiably stopped and arrested the plaintiff for the misdemeanor possession of a false identification without violating the Fourth Amendment, thereby ending the false arrest inquiry as a matter of law.[9] *Figg v. Schroeder*, 312 F.3d 625, 636-37 (4th Cir. 2002) (stating that

_____

[9] The Agents are authorized by statutory law to do so. Virginia Code § 4.1-305(B) directs, in part, that "[n]o person under the age of 21 years shall use or attempt to use any . . . (ii) altered, fictitious, facsimile or simulated document, including, but not limited to a birth certificate or student identification card . . . in order to establish a false identification or false age for himself to consume, purchase or attempt to consume or purchase an alcoholic beverage." Similarly, Virginia Code § 18.2-204.1(B) directs, "any person who . . . possesses . . . any document for the purpose of establishing a false status, occupation, membership, license or identity for himself . . .

21

"'[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender'" (quoting *Atwater v. Lago Vista,* 532 U.S. 318, 333 (2001)); *see also Sevigny*, 846 F.2d at 956 n.4 (noting that "it is the general rule that the offense actually charged by an arresting officer does not limit the basis upon which the validity of his arrest may be upheld.")

The principles above show that it is irrelevant whether the evidence would have been sufficient at this point to convict the plaintiff of this offense, as the totality of the objective facts and circumstances in the FAC show that a reasonable officer could have formed a justifiable belief that he possessed and had attempted to use a false identification, in violation of Va. Code §§ 4.1-305(B) and 18.2-204.1(B). It is also irrelevant whether the plaintiff was ultimately charged with this offense. *Sennett v. United States*, 667 F.3d 531, 535 (4th Cir. 2012) (stating that it is "irrelevant to the probable cause analysis what crime a suspect is eventually charged with") (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Finally, it is irrelevant to the probable cause analysis that the Agents did not attempt to speak to the Trinity bouncers or witnesses before pursuing the plaintiff in light of their observations, as such alternative measures are not constitutionally required. That is, the Supreme Court has stated that the "[r]easonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques." *United States v. Sokolow*, 490 U.S. 1, 11 (1989); *see Kelley v. Myler*, 149 F.3d 641, 647 (7th Cir. 1998) (observing that "[t]he inquiry is whether an

---

is guilty of a Class 1 misdemeanor." The Agents may, thus, arrest for it. *See* Va. Code § 4.1-105 (declaring that ABC's agents "are vested . . . with like power to enforce the provisions of . . . this title and the criminal laws of the Commonwealth"); Va. Code § 19.2-81(B) (authorizing ABC agents to "arrest without a warrant any person who commits any crime in [his] presence").

officer has reasonable grounds on which to act, not whether it was reasonable to conduct a further investigation").[10]

Largely ignored by the FAC, the setting in which the suspected offense occurred is vital. It was 12:45 a.m. on St. Patrick's Day, and many crowded celebrations were taking place on the Corner. The Corner is a location immediately adjacent to a college campus, filled with underage persons, and dominated by restaurants serving alcohol. The Agents, performing their lawful statutory duties, were on the Corner in anticipation of violations of Virginia's alcohol laws, specifically alleged to be surveilling Trinity while the plaintiff waited in a long line to gain entry. Of course, Trinity serves alcohol.

In this environment, the plaintiff, who was underage, attempted to enter Trinity. Trinity, however, was checking identifications at the front door. Once the plaintiff reached the door, he handed the owner an identification card and incorrectly recited the zip code upon inquiry. The plaintiff, who was denied entry, started to walk away. All three Agents allegedly observed the exchange and were thus supplied with the same probable cause to effectuate a lawful arrest of the plaintiff for commission of the misdemeanor offense of possessing a false identification in their presence. Thus, a reasonable officer, based on the amended allegations *set forth on the very face of the FAC*, could have, and most likely *would have*, legally stopped and arrested the plaintiff.

### 2. Even if probable cause was arguable or mistaken, reasonable suspicion existed and soon ripened into probable cause to arrest.

Even if probable cause was only arguable, or if the Agents were mistaken as to probable cause, reasonable suspicion undeniably existed. And, the plaintiff's objective conduct quickly ripened that suspicion into probable cause. Count I also fails under this lens as well.

---

[10]In any event, simply overhearing the plaintiff's confusion and inability to recite his own zip code to the Trinity owner would certainly not have furnished the Agents with any "exculpatory evidence" that could have extinguished the probable cause they already had.

"An investigatory detention of a citizen by an officer must be supported by reasonable articulable suspicion that the individual is engaged in criminal activity." *United States v. Black*, 707 F.3d 531, 537 (4th Cir. 2013) (citing *Terry v*, 392 U.S. at 21). "The level of suspicion must be a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* at 539 (citation omitted). Reasonable suspicion "does not depend upon any one factor, but on the totality of the circumstances." *United States v. Brugal*, 209 F.3d 353, 359 (4th Cir. 2000) (*en banc*). Thus, a police officer "'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *Black*, 707 F.3d at 539 (quoting *Terry*, 392 U.S. at 21)). Reasonable suspicion to conduct a stop may "transform," or "ripen," into probable cause to perform an arrest. *United States v. Johnson*, 599 F.3d 339, 340 (4th Cir. 2010).

The objective, not subjective, facts, *as alleged in the FAC*, show that reasonable suspicion existed to stop the underage plaintiff outside Trinity. All three Agents allegedly observed the plaintiff showing an identification card to the owner of Trinity after standing in a line, incorrectly reciting a zip code on the card, having the card returned, and being "denied entry." The plaintiff started to leave the pub. A reasonable officer in the Agents' position, possessed, at the very least, an articulable and particularized set of facts to believe that criminal activity was afoot, and the Agents were thus well within their legal authority to stop the plaintiff for a suspected offense of possessing a false identification. *See* Va. Code § 4.1-105 (declaring that ABC's agents and employees "are vested . . . with like power to enforce the provisions of . . . this title and the criminal laws of the Commonwealth as is vested in the chief law-enforcement officer of any county, city, or town"); *see also Martin v. Mendoza*, 230 F. Supp. 2d 665, 670-71 (D. Md. 2002) (holding that the record "leaves no room for doubt " that a police officer had

reasonable suspicion to stop an individual whom he had observed unsuccessfully attempt to use a farecard to gain entry to a metro station).

Moreover, as noted above, none of the Agents were under any obligation to conduct an alternative investigation or interview witnesses before stopping the departing plaintiff. *Sokolow*, 490 U.S. at 11. This is because "[s]uch a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and it would require courts to 'indulge in unrealistic second-guessing.'" *Id.* (quotations and citations omitted).

Agents Miller and Custer's reasonable suspicion quickly ripened into probable cause. The plaintiff, having displayed conduct sufficient to warrant a belief of criminal activity, started to walk away from Trinity. Agent Miller followed and stopped the plaintiff from behind. The plaintiff, without saying a word, opposed the stop by force. He pulled away, freed himself, and continued to walk away. At this moment, from the objective perspective of a badged law enforcement officer, the preexisting reasonable suspicion had ripened into probable cause.

The plaintiff's allegedly and objectively silent and forceful conduct did not cease at the first encounter. Agent Miller caught up to and took hold of the plaintiff's arm a second time, requesting the identification card. The plaintiff knew Agent Miller was law enforcement and had admittedly seen his badge by this time. Yet, the plaintiff, *who still had one free arm*, attempted to free himself again with force and reach into his pocket (allegedly) to explain himself and that he had done nothing wrong. In the totality, this attempt to free oneself a second time and reach into a pocket gives rise to a reasonable inference of unknown future conduct. Thus, upon this new act of physical resistance, Agent Miller had further cause to arrest the plaintiff. When the plaintiff attempted to free himself from Agent Custer as well, this third attempt to pull away with

force, *viewed objectively and as stated in the FAC*, further supported probable cause to arrest. The plaintiff's claim for a false arrest, under these circumstances, cannot stand.

### 3. The Agents also possessed probable cause to believe that the plaintiff was obstructing, in violation of Virginia Code § 18.2-460.

The probable cause to arrest the plaintiff for possessing a false identification should end the inquiry.  *See Sevigny*, 846 F.2d at 956 n.4.  Nevertheless, the FAC demonstrates probable cause existed also to arrest the plaintiff, in light of his subsequent and objective conduct during the stop, for the additional offenses of obstruction and public intoxication, in violation of Virginia Code §§ 18.2-460 and 18.2-388.  This additional probable cause defeats Count I.

With respect to obstruction, Virginia Code § 18.2-460 provides that, "[i]f any person without just cause knowingly obstructs a . . . law-enforcement officer . . . in the performance of his duties as such . . . he shall be guilty of a Class 1 misdemeanor."  Va. Code § 18.2-460.  On this offense, the Supreme Court of Virginia has explained:

> To constitute obstruction of an officer in the performance of his duty, it is not necessary that there be an actual or technical assault upon the officer, but there must be acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to "obstruct" ordinarily implies opposition or resistance by direct action and forcible or threatened means.

*Love v. Commonwealth*, 212 Va. 492, 495 (1971) (quotation omitted).  Various circumstances, even minor in nature, have supported findings of probable cause to arrest for obstruction.  *See e.g., Figg*, 312 F.3d at 637 (holding that a plaintiff's exiting from her vehicle during a traffic stop after being ordered to remain inside the vehicle made it "undisputed that the officers at the scene had probable cause to believe that [the plaintiff] had violated Virginia's obstruction of justice statute"); *Smith v. Ray*, 855 F. Supp. 2d 569, 586 (E.D. Va. 2012) (holding that "even a minor act of resistance can be considered obstruction of justice" and finding that the act of "pulling [an] arm away" from a police officer established probable cause for an arrest); *Guerrero v. Deane*,

750 F. Supp. 2d 631, 653 (E.D. Va. 2010) (holding that a police officer had probable cause to arrest a plaintiff simply for being "about to commit" an obstruction when he suddenly came toward the officer, made hand gestures, and stood "very close"); *Coffey v. Morris*, 401 F. Supp. 2d 542, 547 (W.D. Va. 2005) (finding probable cause to arrest a plaintiff for obstruction when she left her vehicle during an investigation and attempted to walk to her nearby residence).

Here, the FAC confirms that the plaintiff applied objective force when he pulled away and tried to free himself from Agents Custer and Miller *three times*. Moreover, the plaintiff, who was walking away from Trinity, alleges that Agent Cielakie was at the door of Trinity and witnessed the plaintiff use this force to pull away. Again, this repeated pulling away suffices to establish probable cause for the offense of obstruction under Virginia law. *See e.g., Brown v. Commonwealth*, No. 0770-09-2, 2010 Va. App. LEXIS 20, at *6 (Va. Ct. App., Jan. 19, 2010) (holding that a defendant's "act of pulling his arm from [a police officer] constituted active resistance against a police officer so as to constitute obstruction of justice.")

Additionally, the objective facts stated in the FAC support a justifiable and reasonable belief that the plaintiff's acts were also intended to obstruct the Agents in their duties of stopping and arresting him. The facts and circumstances show objective signs of physical resistance, permitting such a charge. *See Martin*, 230 F. Supp. 2d at 671 (holding that a plaintiff's decision to, in part, "jerk away" from and say "don't touch me" to a police officer during a stop pertaining to a metro farecard demonstrated probable cause to arrest for disorderly conduct).

It is well-settled that "[a] warrantless arrest of an individual in a public place for [even] a . . . misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003); *see Atwater* v. *Lago Vista,* 532 U.S. 318, 354 (2001) (stating that "[i]f an officer has probable cause

to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). Under the alleged facts and circumstances, the Agents had probable cause to arrest the plaintiff without a warrant for the offense of obstruction. The plaintiff was walking away, forcefully opposed Agent Miller's approach, and repeatedly attempted to "free himself" from a lawful apprehension. Irrespective of whether the evidence is ultimately sufficient to convict the plaintiff, a reasonable police officer could have believed that the plaintiff was obstructing or about to obstruct, irrespective of his subjective intent. The plaintiff's conduct, as alleged and viewed from the perspective of an officer at the scene, defeats his claim, and the Agents did not violate the Fourth Amendment.

> **4.** **The Agents also possessed reasonable suspicion and probable cause to believe that the plaintiff was violating Virginia Code § 18.2-388.**

The Agents also possessed probable cause to arrest the plaintiff for public intoxication, in violation of Virginia Code § 18.2-388, which directs, in part, that, "[i]f any person . . . is intoxicated in public . . . he shall be deemed guilty of a Class 4 misdemeanor." Virginia law defines "intoxicated" as "a condition in which a person has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior." Va. Code § 4.1-100. No requirement exists in Virginia that a person be "physically impaired" in order to be legally intoxicated. *See McGhee v. Commonwealth*, 280 Va. 620, 624 (2010) (recognizing the decision in *United States v. Brown*, 401 F.3d 588 (4th Cir. 2005), but merely "assuming without deciding" that a physical impairment is a requirement for the offense).

The totality of the FAC's objective, *not subjective*, facts and circumstances justifies a belief that the Agents had probable cause to arrest the plaintiff for public intoxication. A reasonable police officer could have believed that the plaintiff's behavior outside Trinity, coupled with his admitted "confusion" and inability to recite a zip code on his own identification

card, was the result of alcohol.  The plaintiff's conduct outside Trinity objectively supports the belief.  Moreover, the plaintiff admits he made statements after his arrest, and these statements led to the charge.  Rather than disclose those statements to this Court, the FAC argues that the statements were "illegally" obtained.  The plaintiff's argument is contrary to law.  That is, the criminal fruits of the poisonous tree doctrine, which would prevent such statements from being disclosed in a criminal case, is inapplicable to this civil case for damages under 42 U.S.C. § 1983.  *See e.g., Chadwell v. Brewer*, 59 F. Supp. 3d 756, 765 (W.D. Va. 2014) (Conrad, J.); *Ware v. James City County*, 652 F. Supp. 2d 693, 705 (E.D. Va. 2009).  Thus, this Court may reasonably infer that the plaintiff's statements were incriminating as to his use of alcohol. *Arrington v. City of New York*, No.15-170, 2015 U.S. App. LEXIS 18005, at *5-6 (2d Cir. Oct. 15, 2015) (holding that it would not be "manifestly unreasonable" to consider information learned after an arrest under the totality of the circumstances).  Thus, to the extent the plaintiff limits his false arrest claim to the public intoxication charge, this Court should reject the attempt.

### 5. The FAC fails to state a claim for false arrest against Agent Cielakie under a theory of bystander liability.

The FAC now attempts to assert bystander liability for false arrest against Agent Cielakie, alleging that he observed the exchange between the plaintiff and Agents Custer and Miller in close proximity and, nevertheless, "chose not to act while Agents Custer and Miller effected [*sic*] an . . . arrest of Martese.  (FAC ¶¶ 78-82).  Under a theory of bystander liability, an officer is only liable if he: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  *Randall v. Prince George's Cty.*, 302 F.3d 188, 204 (4th Cir. 2002).

The plaintiff's attempt to keep Agent Cielakie in this action through a bystander liability theory is not only meritless but it also suggests a desperate ploy to fashion some link, for

29

whatever purpose, to the drastically distinct *Daly* case. This attempt should fail. The FAC does not sufficiently and plausibly satisfy the elements to a bystander liability claim of false arrest. On its face, the FAC alleges that the Agents, all of whom were on the Corner at 12:45 a.m., observed the underage plaintiff stand in a line, present his identification at the door of a pub, incorrectly recite his own zip code, be returned his identification and denied entry, and walk away. Agent Cielakie, who did not even pursue the plaintiff, then witnessed the plaintiff use force *three times* to "free himself" from Agents Custer and Miller. These alleged circumstances, all of which happened quickly, objectively supported reasonable suspicion and probable cause to arrest the plaintiff for the reasons above. Thus, this claim in Count I should be dismissed.

**E.   The FAC fails to state a plausible claim for excessive force against the Agents under 42 U.S.C. § 1983 (Count II).**

Count II also fails to state a claim for excessive force. The Fourth Circuit has opined that "all claims of excessive force in the course of any seizure of a free person must be analyzed under an 'objective reasonableness' standard." *Jones v. Buchanan*, 325 F.3d 520, 532 (4th Cir. 2003) (quoting *Graham v. Connor*, 490 U.S. 386, 395-96). Applying this analysis, a court reviews the facts and circumstances "'from the perspective of a reasonable officer on the scene,' and avoid[s] judging the officer's conduct with the '20/20 vision of hindsight,' recognizing that 'police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (quoting *Graham*, 490 U.S. at 396-97) (alteration added). "The right to make an arrest carries with it the right to use the amount of force that a reasonable officer would think necessary to take the person being arrested into custody." *Martin v. Gentile*, 849 F.2d 863, 869 (4th Cir. 1988). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers', violates the Fourth Amendment." *Graham*, 490 U.S. at 395 (internal citations omitted). "The court's focus should be on the

circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

### 1. The *Graham* factors weigh in favor of the Agents.

In examining a claim of excessive force, a court considers the facts and circumstances of each case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. "The extent of the plaintiff's injury is also a relevant consideration." *Jones*, 325 F.3d at 527.

The totality of the alleged facts and circumstances show that the plaintiff was *not* subjected to unreasonable force in violation of the Fourth Amendment. As set forth above, reasonable suspicion and probable cause existed to stop and arrest the plaintiff for the criminal offenses of possessing a false identification as well as obstruction and public intoxication. The *Graham* factors all weigh against a finding of excessive force here, even as pled by the plaintiff. The possession of a false identification and resisting a lawful stop or arrest by force are Class 1 misdemeanors. They are serious crimes and punishable by jail time. Thus, the first of the *Graham* factors weighs against the plaintiff.[11]

The second *Graham* factor also weighs against the plaintiff. The plaintiff admits that, knowing he was faced with police officers asking to see his identification, he repeatedly attempted to free himself, pull away, and reach into his pocket, albeit while subjectively trying to explain he had done nothing wrong. The plaintiff performed such acts no less than three times during the stop. In a tense and uncertain situation, these acts could have caused a reasonable

---

[11] This case is distinct from cases when courts have found excessive force. For example, such force was found when an officer broke and crushed a plaintiff's nose even though he was "not suspected of any crime" *Jones*, 325 F.3d at 527-28, 531, or when a plaintiff was tackled after picking up a "$5 bill that did not belong to him." *Rowland v. Perry*, 41 F.3d 167 (4th Cir. 1994).

officer to make the split-second decision to prevent the plaintiff from leaving or to protect his or her own safety. "If an officer reasonably but mistakenly believed that a suspect was likely to fight back . . . the officer would be justified in using more force than in fact was needed." *Brown v. Gilmore* 278 F.3d at 369.

Furthermore, notwithstanding the FAC's subjective assertions, the objective factual allegations show that the plaintiff physically resisted and attempted to leave, such that the third *Graham* factor weighs squarely in favor of the Agents. The plaintiff alleges that he repeatedly attempted to "free himself," walk away, and even reach into his pocket while law enforcement was attempting to restrain his arms. The plaintiff's physical acts and attempts to "free himself" from Agents Custer and Miller led to a sudden fall from which the plaintiff sustained an injury. The plaintiff's subjective assessment that he was "grabbed" and "slammed" down is not supported by any objective facts and is simply inconsistent with the totality of the alleged facts and circumstances. *See Martin*, 230 F. Supp. at 671-72 (rejecting, in reviewing an excessive force claim, a plaintiff's "subjective assertions" that he was "grabbed" and "pushed against a wall" and that he "experienced muscle soreness" as a result). The plaintiff also admits that, objectively, he continued to "writhe" or twist from side-to-side while the Agents attempted to handcuff him. *See Dunn v. Vanmeter,* No. 5:09-cv-00085, 2010 U.S. Dist. LEXIS 79949 at *17 (W.D. Va. 2010) (Conrad, J.) (holding that "[a plaintiff's] subjective belief that his struggling was necessary to stave off injury is not relevant to the issue of whether [the officer] reasonably believed that he was resisting arrest.") In light of the additional fact that not a single act of force occurred after the plaintiff's arrest, Count II fails to state a claim for excessive force and should be dismissed with prejudice.

### 2. The alleged handcuffing is not excessive force.

Additionally, the plaintiff's claim of excessive force through the use of handcuffs does not state a plausible claim for constitutional violation of excessive force. The plaintiff admits that while on the ground he objectively continued to twist or struggle while stating only, "I go to UVA." He has no physical injuries from the handcuffs. Thus, any excessive force claim arising from the handcuffing fails. *See Deavers v. Vasquez*, 57 F. Supp. 3d 599, 607 (E.D. Va. 2014).

The FAC again advances insufficient allegations against Agent Cielakie for excessive force as his alleged role was limited to employing a second set of handcuffs and leg shackles only after the plaintiff was already on the ground and twisting around. (FAC ¶¶ 88(f)-(g).) Agent Cielakie caused no injury to the plaintiff, and the plaintiff complained to him of no pain. *See also Carter v. Morris*, 164 F.3d at 219 n.3 (holding that a claim that handcuffs were too tight during an arrest failed to state excessive force); *Guerrero*, 750 F. Supp. 2d at 655 (dismissing an excessive force claim when a plaintiff claimed that his handcuffs were too tight but caused no injury). As such, Count II fails to state a claim for excessive force against Agent Cielakie and the other Agents arising from the use of handcuffs.

### 3. The FAC fails to state a claim for excessive force against Agent Cielakie under a theory of bystander liability.

Perhaps conceding the limited role Agent Cielakie played in the encounter on March 18, 2015, the plaintiff again seeks to impose liability in a strained fashion – through bystander liability. Yet, as with his attempt to do so with the false arrest claim, the FAC also fails to state an excessive force claim under this theory. First, as previously discussed, the totality of the objective facts and circumstances alleged in the FAC show no constitutional violation by the stop and arrest of the plaintiff. Second, the same facts and circumstances alleged in the FAC affirmatively demonstrate that Agent Cielakie had no time to stop the very gravamen of the

plaintiff's excessive force claim, namely being "immediately" "slammed" to the ground "all of a sudden." (*See e.g.* FAC ¶ 33 (alleging "Miller immediately proceeded to this . . . use of force"), ¶ 40 (the plaintiff was "slammed" to the ground "all of a sudden, and without provocation"), ¶ 97 (characterizing the alleged constitutional violation as an "immediate escalation to the use of force")). In this manner, Agent Cielakie had no opportunity to prevent this act or even to choose not to act. Thus, the FAC fails to allege the *prima facie* elements of a bystander liability claim, and Count II fails against Agent Cielakie under this theory.[12]

### F. The FAC fails to state a claim for gross negligence against the Agents (Count IV).

Under Virginia law, gross negligence "is a heedless and palpable violation of legal duty respecting the rights of others." *City of Lynchburg v. Brown*, 270 Va. 166, 170 (2005) (citation omitted). "It must be such a degree of negligence as would shock fair minded men although something less than willful recklessness." *Ferguson v. Ferguson*, 212 Va. 86, 92 (1971). "[T]o state a claim for gross negligence, a plaintiff must plead the regular elements of a negligence claim [which] . . . include a legal duty imposed on the defendant, the defendant's breach of that duty, and consequent damage." *Reid v. Newton*, No. 3:13-cv-572, 2014 U.S. Dist. LEXIS 52072, at *20 (E.D. Va. 2014) (dismissing a gross negligence claim in a § 1983 action where a plaintiff failed to plead a plausible cause of action). A plaintiff must also allege conduct "which shows an

---

[12] Additionally, unlike the original Complaint, the FAC now alleges that Agent Cielakie merely observed the detention and arrest of the plaintiff, and only arrived at the plaintiff on the ground *after* the arrest to assist in handcuffing his hands and feet. (FAC ¶¶ 46, 79, 80, 81, 82.) If the plaintiff was in fact an "arrestee" at the time Agent Cielakie allegedly acted, then the plaintiff would be required to plead and prove an excessive force claim against him under the 14th Amendment Due Process Clause, rather than the Fourth Amendment. *See e.g. Orem v. Rephann*, 523 F.3d 442 (4th Cir. 2008) (analyzing an arrestee's claim of excessive force by officer during transport to booking before formal charges issued under 14th Amendment rather than Fourth Amendment, the former of which containing different requirements of proof). Here, the FAC fails to allege sufficient factual allegations to support an excessive force claim under either constitutional theory, and Count II should be dismissed against Agent Cielakie.

utter disregard of prudence amounting to complete neglect of the safety of another." *Frazier v. City of Norfolk*, 234 Va. 388, 393 (1987). Stated differently, he must allege conduct that constitutes a "want of even scant care and amounts to the absence of slight diligence." *Id.* (citing *City of Lynchburg*, 270 Va. at 170).

Here, the amended allegations in the FAC demonstrate that the Agents exercised care and compliance with their legal and professional obligations. As previously discussed, the FAC shows the existence of reasonable suspicion and probable cause, respectively, to stop and arrest the plaintiff for multiple criminal offenses. Moreover, the acts the Agents took do not demonstrate a want of scant care or lack of slight diligence. Rather, the Agents approached the plaintiff one at a time, rather than all at once. Only once the plaintiff began to exert physical force, allegedly to explain himself, the Agents successively escalated the response. Their approach and escalated response demonstrate care and attention to training.

And, only after the three men had fallen to the ground, Agent Cielakie came in to assist to employ a second pair of handcuffs, rather than continue with the single pair and exert unnecessary force or injury upon the twisting plaintiff. Finally, no act of force is alleged after the plaintiff was arrested, and the Agents immediately provided him medical treatment. These facts and circumstances in their totality demonstrate more than scant care and do not state a plausible or sufficient claim of gross negligence. This Court should dismiss Count IV.

### G. The FAC fails to state a claim for assault against the Agents (Count VI).

Under Virginia law, "[t]he tort of assault consists of an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in that other person's mind a reasonable apprehension of an imminent battery." *Koffman v. Garnett*, 265 Va. 12, 16 (2003). "A person cannot be convicted of assault and battery 'without

an intention to do bodily harm - either an actual intention or an intention imputed by law.'" *Gilbert v. Commonwealth*, 45 Va. App. 67, 71 (2005) (quoting *Davis v. Commonwealth*, 150 Va. 611, 617 (1928)).

The FAC does not allege a plausible claim of assault against the Agents. First, nothing in the FAC demonstrates that the Agents more conceivably than not intended to inflict bodily harm on the plaintiff as opposed to simply effectuating his arrest. In other words, the requisite intent for an assault claim is entirely absent. Second, the plaintiff allegedly did not even see Agents Custer and Miller come up to him, so no apprehension of bodily harm could have resulted from the contact. Falling to the ground was also "sudden," precluding apprehension of the same. Finally, no allegation shows that the plaintiff was placed in apprehension of bodily harm by being subsequently handcuffed by Agent Cielakie.

Moreover, the Agents' alleged contact with the plaintiff was legally justified. "A legal justification for the act being complained of will defeat an assault or battery claim." *Unus v. Kane*, 565 F.3d 103, 117 (4th Cir. 2009) (citing *Koffman, supra*). "Virginia recognizes that police officers are legally justified in using reasonable force to execute their lawful duties." *Id.* (citing *Pike*, 197 Va. 692); *Gnadt v. Commonwealth,* 27 Va. App. 148, 151 (1998) (observing that a "police officer does not commit a battery when he touches someone appropriately to make an arrest"); *see Tatum v. Shoemaker*, No. 7:10-cv-00296, 2012 U.S. Dist. LEXIS 35475, at *15 (W.D. Va. 2012) (Kiser, J.) (recognizing Virginia's "special protection" of police officers, and dismissing an assault claim by a plaintiff, who had been forcibly subdued and shackled with cast-iron after attempting to walk out of an interview room). As set forth above, and reflected on the face of the FAC alone, the Agents clearly possessed reasonable suspicion and probable cause to, respectively, stop and arrest the plaintiff for numerous offenses. The Agents were also legally

authorized to make the arrest.  *See also* Va. Code § 19.2-81(B) (providing that an ABC agent may "arrest without a warrant any person who commits any crime in [his] presence.")  Thus, the FAC fails to state a claim for assault, and this Court should dismiss Count VI with prejudice.

### H. The FAC fails to state a claim for battery against the Agents (Count VII).

Similarly, the plaintiff has also alleged no plausible claim of battery against the Agents. "The tort of battery is an unwanted touching which is neither consented to, excused, nor justified." *Koffman*, 265 Va. at 16.  A plaintiff is "required to prove both a 'wrongful act' and resultant physical injury." *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994) (citing *Pike v. Eubank*, 197 Va. 692 (1956)); *Corbin v. Woolums*, No. 3:08-cv-173, 2008 U.S. Dist. LEXIS 95977, at *29 (E.D. Va. 2008).  Again, "[a] person cannot be convicted of assault and battery 'without an intention to do bodily harm - either an actual intention or an intention imputed by law.'"  *Gilbert*, 45 Va. at 71.

The plaintiff has failed to state a plausible claim for battery.  The FAC simply does not show that any of the Agents had the intent to inflict bodily harm upon the plaintiff, as opposed to merely arresting him.  Certainly, none of the Agents said anything to indicate intent to inflict bodily harm.  And, Agent Cielakie's limited role in handcuffing the plaintiff without an injury does not evidence such intent.  Moreover, as with the assault claim, a legal justification existed for the plaintiff's stop and arrest for the purposes of a battery –reasonable suspicion and probable cause.  All of these bases warrant the dismissal of Count VII against the Agents.[13]

---

[13] While this conclusion refers to the Agents collectively, it is important to view each agent individually for the purposes of his personal liability.  The plaintiff has sued them for $3,000,000 and should not be able to lump them into some single and amorphous entity to attribute fault.

## I.        Walker and the Agents are entitled to qualified immunity to all claims.

Finally, Walker and the Agents are entitled to qualified immunity on all claims.  The Fourth Circuit has emphasized that claims of qualified immunity are especially appropriate for expedited review because immunity is an "entitlement not to stand trial or face the other burdens of litigation."  *Turner v. Dammon*, 848 F.2d 440, 443 (4th Cir. 1988) (quoting *Mitchell v. Forsythe*, 472 U.S. 511, 530 (1985)).  The doctrine of qualified immunity provides that "government officials performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

In *Anderson v. Creighton*, 483 U.S. 635 (1987), the Supreme Court reaffirmed the principle that a police officer is entitled to qualified immunity from civil damages in Fourth Amendment cases where it is established that a reasonable officer could have believed an action was lawful, even if it was not.  *See Sevigny,* 846 F.2d 953.  Police officers are shielded from liability "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated."  *Anderson*, 483 U.S. at 638.  The Supreme Court has defined the requisite objective legal reasonableness; thus, "the contours of the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates the law."  *Anderson*, 483 U.S. at 640.  In other words, "in light of the pre-existing law, the unlawfulness must be apparent."  *Id*.  On this point, the Supreme Court stated that it must be "beyond debate" that a right is clearly established so as to defeat a defense of qualified immunity.  *Mullenix v. Luna*, No. 14-1143, 2015 U.S. LEXIS 7160 at *17 (November 9, 2015) (finding qualified immunity for a police officer where a plaintiff alleged the officer had used excessive force by

38

shooting six times from an overpass at her intoxicated decedent's fleeing vehicle, causing the decedent's death).

Additionally, "it is precisely the function of qualified immunity in this context to excuse reasonable mistakes in making the composite factual and legal judgments leading to an arrest." *Sevigny*, 846 F.2d at 957. The "qualified immunity standard gives ample room for mistaken judgments." *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011) (internal quotation marks omitted). Qualified immunity protects public officials from "bad guesses in gray areas." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). "'The issue for [qualified] immunity purposes is not probable cause in fact but *arguable* probable cause.'" *Plaster v. Boswell*, *et al.*, No. 6:05-cv-00006, 2007 U.S. Dist. LEXIS 80197, at *23 (W.D. Va. 2007) (emphasis added) (citations omitted) (holding that arguable probable cause existed to entitle a police officer to qualified immunity as to the validity of an arrest and search warrant).

Here, even if the Agents mistakenly believed that the plaintiff had committed criminal offenses, such a mistake does not amount to a constitutional deprivation. Rather, as explained above, the facts and circumstances prove that the Agents had reasonable suspicion and *more than arguable* probable cause to stop and arrest the plaintiff. The Agents approached the plaintiff to stop him. Yet, in three different instances, he physically pulled away, attempted to "free himself," and kept on walking. He also reached into his pocket at the same time. Under existing law, a reasonable officer could have believed that criminal activity was afoot and reasonably relied upon the Supreme Court of Virginia precedent that a person has no right to physically resist or use any force, even if he subjectively believes a stop is unlawful. *Commonwealth v. Hill*, 264 Va. 541, 548 (2002) (holding that "a person in this Commonwealth does not have the right to use force to resist an unlawful detention.")

The Agents did not violate the plaintiff's rights, and it is not "beyond debate" that a reasonable officer would have believed his conduct violated a clearly established right. Moreover, the allegations against Walker are non-existent and do not defeat qualified immunity. Thus, qualified immunity applies. *Brown v. Gilmore*, 278 F.3d at 367-68 (finding qualified immunity because a reasonable officer could have believed a plaintiff was resisting arrest).

## III.  CONCLUSION

WHEREFORE, the defendants request that this Court grant their Motion to Dismiss, dismiss all claims with prejudice, and award them any other relief deemed just.

**Respectfully submitted,**

**VIRGINIA DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, SHAWN WALKER, JARED MILLER, THOMAS CUSTER, JOHN CIELAKIE**

By _____/s/ Nicholas F. Simopoulos_____
Nicholas F. Simopoulos (VSB No. 68664)
General Civil and Trial Unit Manager
Assistant Attorney General
Alexander K. Page (VSB No. 78894)
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond, Virginia 23219
(804) 786-8199 Telephone
(804) 371-2087 Facsimile
nsimopoulos@oag.state.va.us
apage@oag.state.va.us

Mark R. Herring
Attorney General of Virginia

Rhodes B. Ritenour
Deputy Attorney General

40

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of June, 2016, I electronically filed the foregoing with

the Clerk of the Court using the CM/ECF system, which will send a notification of such filing

(NEF) to counsel of record for the plaintiff.

By _____/s/_Nicholas F. Simopoulos_____
Nicholas F. Simopoulos (VSB No. 68664)
General Civil and Trial Unit Manager
Assistant Attorney General
Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-8199
Facsimile: (804) 371-2087
Email: nsimopoulos@oag.state.va.us
*Counsel for Defendants*