**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**Charlottesville Division**

| | |
|---|---|
| MARTESE JOHNSON, | |
| Plaintiff, | |
| v. | Civil Action No. 3:15-cv-00055-GEC |
| DEPARTMENT OF ALCOHOLIC BEVERAGE CONTROL, JARED MILLER, THOMAS CUSTER, JOHN CIELAKIE, and SHAWN P. WALKER | |
| Defendants. | |

**PLAINTIFF MARTESE JOHNSON'S OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF FACTS ....................................................................................1

    I. The Events of March 17, 2015 ....................................................................1

    II. ABC's and Director Walker's Failure to Supervise or Train.......................5

ARGUMENT ........................................................................................................6

    I. Mr. Johnson Alleges Ample Facts to State Claims That Are Facially Plausible ............6

    II. Mr. Johnson Properly Pled False Arrest in Violation of the Fourth Amendment (Count I) ...............7

        A. The Agents Did Not Have Probable Cause to Arrest Mr. Johnson for Possessing a Fake Identification Card ..............8

        B. The Agents Did Not Have Probable Cause to Arrest Mr. Johnson for Obstruction of Justice ....................11

        C. The Agents Did Not Have Probable Cause to Arrest Mr. Johnson for Public Intoxication .....................14

    III. Mr. Johnson Has Stated an Excessive Force Claim Against the Agents (Count II)....16

        A. The *Graham* Factors Weigh Strongly in Favor of Mr. Johnson......................16

        B. Agent Cielakie Engaged in Excessive Force...................................21

    IV. The FAC States a Claim for Bystander Liability Against Cielakie (Counts I & II)....21

    V. Mr. Johnson Has Stated a §1983 Failure to Train or Supervise Claim Against ABC (Count III) ...................24

        A. As A Self-Funding, Autonomous Entity, ABC Is Not Immune Under the Eleventh Amendment...................24

        B. As ABC is Not an Arm of the State, It is a "Person" Under §1983.................30

    VI. Mr. Johnson Has Alleged Sufficient Facts to State a Plausible Claim for Failure to Train or Supervise (Count III) ...................30

    VII. Defendants Are Not Entitled to Qualified Immunity as Their Conduct Clearly Violated Mr. Johnson's Well-Established Constitutional Rights and Was Unreasonable .....................35

A. The Agents Are Not Entitled to Qualified Immunity on Mr. Johnson's False Arrest Claim ...................................................................................................36

B. The Agents Are Not Entitled to Qualified Immunity on Mr. Johnson's Excessive Force Claim ..................................................................................37

C. Walker Is Not Entitled to Qualified Immunity on Mr. Johnson's *Monell* Claim ...........................................................................................................37

VIII. Mr. Johnson Properly Alleges Assault and Battery Claims Against All of the Agents (Counts VI and VII) ...............................................................................38

IX. Mr. Johnson Properly Pled His Claim for Gross Negligence (Count IV) .................40

X. Mr. Johnson States a Negligent Supervision and Training Claim Against Walker Under Virginia Law (Count V) ...............................................................................41

CONCLUSION ..............................................................................................................44

Case 3:15-cv-00055-GEC-JCH   Document 53   Filed 06/17/16   Page 3 of 48   Pageid#: 890

Plaintiff Martese Johnson, by and through his undersigned counsel, hereby opposes Defendants Department of Alcoholic Beverage Control ("ABC"), Jared Miller, Thomas Custer, John Cielakie, and Shawn P. Walker's (collectively, "Defendants") Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") ("Defendants' Motion"). Mr. Johnson has properly stated constitutional and state law claims against Defendants arising out of his brutal arrest and battery, which should proceed.

## INTRODUCTION

Despite implicitly recognizing the numerous factual issues raised by Mr. Johnson's FAC, Defendants still seek to foreclose Mr. Johnson from pursuing his claims stemming from the events of March 17, 2015—the night Defendants Miller, Custer, and Cielakie (the "Agents") brutally seized Mr. Johnson without probable cause and in violation of his Fourth Amendment rights. Indeed, just as before, the majority of Defendants' arguments represent nothing more than attempts to argue facts different from those alleged in the FAC and to draw certain inferences in their favor (in violation of the relevant standards), while at the same time distorting the facts as actually pled. Similarly, Defendants make blanket conclusions of law while ignoring the well-pled facts and contrary case law that belie their assertions. Under the proper analytical framework and considering the facts as actually pled, Mr. Johnson's FAC clearly states plausible claims for relief. Further, Defendants' immunity claims are premature, and in any event, without merit. At bottom, Defendants' multi-faceted attack on Johnson's FAC is unavailing and the Court should deny Defendants' Motion.

## STATEMENT OF FACTS

### I.     The Events of March 17, 2015

As pled in the FAC, on the night of March 17, 2015, Mr. Johnson and a friend decided to go to Trinity Irish Pub, a restaurant and bar in an area adjacent to the University of Virginia

("UVa") known as "the Corner." FAC ¶¶ 16, 18. In Virginia, persons under the age of twenty-one are permitted to enter bars, and both bars and restaurants on the Corner routinely allow such individuals to enter after presenting a valid form of identification. FAC ¶ 19.

After waiting on line at Trinity, Mr. Johnson presented a valid identification card to the owner, but "inadvertently provided a zip code different than that on his identification" because he had recently moved. FAC ¶ 20. Unbeknownst to Mr. Johnson, ABC Agents Miller, Custer, and Cielakie watched Mr. Johnson's exchange with the owner of Trinity. FAC ¶ 24.

Importantly, "[n]one of the Agents could hear the conversations that occurred while [Mr. Johnson] was at Trinity" and "they did not know why [he] was denied entry to the bar." FAC ¶ 25. "The Agents merely witnessed an individual cordially hand his identification to the bouncers at Trinity, the bouncers cordially return the identification to the individual, and the individual having a cordial conversation with the owner before beginning to walk away." FAC ¶ 27. Moreover, "[t]he three Agents did not see any signs of intoxication while surveilling [Mr. Johnson]; nor did the Agents witness Martese conduct himself in a belligerent manner as [he] turned to walk away from Trinity." FAC ¶ 26.

Based on this single set of observations, without possessing any other information, Agent Miller approached Mr. Johnson "from behind and grabbed his arm." FAC ¶ 28. "Miller approached Martese from behind in such a way as to obscure the fact that he was law enforcement." FAC ¶ 29. Nevertheless, "Miller did not identify himself as law enforcement or otherwise attempt to introduce himself to Martese before grabbing his arm." FAC ¶ 28. Miller did not even "stop to speak to the owner of or any other bouncers at Trinity before grabbing [Mr. Johnson]. Nor did he otherwise learn why [Mr. Johnson] had been denied entry from Trinity." FAC ¶ 30.

"Due to the manner in which Miller approached Martese, Martese did not see Miller before Miller grabbed his arm. Nor did Martese realize that Miller was law enforcement." FAC ¶ 31. Thus, Mr. Johnson, "startled from being grabbed from behind by someone he did not know, instinctively pulled his arm away and tried to continue walking." *Id.* Still without saying a word, Agent Miller "followed Martese and again grabbed his arm, holding his elbow." FAC ¶ 32. Only *after* this second unwarranted and unannounced contact did Agent Miller "demand[ ] to see Martese's 'fake' identification card, while aggressively attempting to twist Martese arm behind his back." *Id.* Even then, "Miller still had not identified himself as law enforcement." *Id.* Indeed, "Miller immediately proceeded to this escalated and unnecessary use of force without first attempting to speak with [Mr. Johnson] and without using any de-escalation procedures that might have been applicable to the situation." FAC ¶ 33. He did not even "order Martese to stop or give any other verbal indication that Martese was not free to leave." *Id.*

Finally, *after* having his arm twisted behind his back without provocation (and without being given any notification that Miller was an ABC agent), Martese "saw the officer's badge and realized that he was a member of law enforcement." FAC ¶ 34. At that point, Johnson immediately tried to cooperate with Agent Miller. FAC ¶ 35. "He began speaking with Miller so as to explain to the Agent that he had done nothing wrong and did not possess a fake identification card." *Id.* He then tried to free his arm from Miller so that he could "comply with Miller's order" and show the agent his identification card. *Id.*

While all of this was occurring, Agent Custer, who had been watching the exchange, approached and "grabbed Martese's left arm, effectively restraining him and preventing him from complying with Miller's order." FAC ¶ 36. Again, Johnson "was not yelling, did not appear intoxicated, and was not aggressive towards the Agents. Instead he attempted to cooperate with

the agents, comply with their orders, and explain the situation to them." FAC ¶ 37. Moreover, Mr. Johnson "was not armed, and the Agents did not suspect him of being armed." FAC ¶ 38.

Yet, "[a]s Martese continued to try to reach his identification card and to explain the situation to the Agents, all of a sudden, and without provocation, Custer and Miller slammed Martese into the brick walkway, face first, causing Martese to suffer a severe laceration to his forehead and scalp." FAC ¶ 40. Despite having "blood streaming down his face," Agent Custer then "roughly and aggressively handcuffed Martese's left hand, while Custer and Miller continued to pin Martese to the ground, despite his compliance." FAC ¶¶ 41-42. Rather than showing any sign of being dangerous, Mr. Johnson, "who had been rendered effectively helpless and barely able to move due to his injuries and the two agents roughly restraining him, was writhing in pain." FAC ¶ 43.

Throughout this encounter, Agent Cielakie "was in close proximity to Miller, Custer, and Martese" with "clear line of sight to the group, and, on information and belief, heard their conversation" and "witnessed the entire unconstitutional detention and excessive use of force." FAC ¶¶ 45-46. "Yet despite his proximity to and observation of the other Agents' unprovoked, violent, and unnecessary actions, he did nothing to intervene or to try and prevent them from injuring Martese." FAC ¶ 46. "To the contrary, ABC Agent Cielakie joined Custer and Miller, and roughly and aggressively handcuffed Martese's right hand with a second set of handcuffs and connected the pairs behind Martese's back." FAC ¶ 47. "Cielakie then unnecessarily shackled Martese's legs together without sufficient provocation." FAC ¶ 49. "In pain and in shock, with blood streaming down his face and Miller and Custer on his back, Martese kept repeating to the officers 'I go to UVa' in a desperate attempt to identify himself." FAC ¶ 48.

The Agents placed Mr. Johnson under arrest, but did not inform him of his Miranda rights.

FAC ¶ 50. Martese was transported to the hospital where he received ten stitches to his forehead and scalp, and suffered from several smaller lacerations, facial swelling, bruising, and permanent scarring to his forehead. FAC ¶¶ 51-52, 57-58. On June 11, 2015, the Commonwealth Attorney for the City of Charlottesville dismissed all charges against Mr. Johnson, FAC ¶ 56, who now, one year later, has earned his degree from UVa and started work in New York City.

## II. ABC's and Director Walker's Failure to Supervise or Train

The ABC "is an agency, which is funded solely through its own revenues and tasked with controlling the distribution of alcoholic beverages and enforcing the laws of the Commonwealth pertaining to alcoholic beverages." FAC ¶ 11. "ABC is run by a board which directs all agency operations, including promulgating its own regulations and appointing all employees of ABC." *Id.*

"ABC agents have a history of aggressive, excessive, and unjustified behavior in effectuating their duties. This history stems from and is caused by a systemic failure to train and supervise agents by Defendants ABC and Director Walker." FAC ¶ 59. As detailed by the FAC, "ABC's numerous failures to properly train and supervise its agents are highlighted by an incident in April 2013 also involving University of Virginia students." FAC ¶ 60. "There, ABC agents, including Cielakie, swarmed the car of twenty-year-old Elizabeth Daly and slammed on her windows using steel flashlights and punched out her windshield, mistaking the case of water she was carrying for a case of beer." *Id.* "Like [Mr. Johnson], Daly was arrested and spent several hours in jail." FAC ¶ 61. The charges against her were also dropped by the Commonwealth Attorney's Office. *Id.*

The FAC specifically alleges that, "[b]ased on the Daly incident, and others that Plaintiff believes to have occurred, ABC and Walker had specific knowledge of the policy, custom, or widespread practice of ABC officers' use of unreasonable, disproportionate, and wrongful force

and tactics in approaching suspects believed to have committed minor infractions or non-violent offenses," but failed to change or address this practice. FAC ¶¶ 62, 64. Even "[o]ther law enforcement agencies have reacted to ABC's heavy-handed tactics by reducing its access and participation in joint operations." FAC ¶ 63.

## ARGUMENT

### I. Mr. Johnson Alleges Ample Facts to State Claims That Are Facially Plausible

Pursuant to Federal Rule of Civil Procedure 8, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, a motion to dismiss pursuant to Rule 12(b)(6) must be denied so long as the complaint alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Applying the plausibility standard outlined in *Twombly* and *Iqbal*, the court need only determine whether the factual allegations contained within the plaintiff's complaint "raise a right to relief above the speculative level." 550 U.S. at 555. And a claim is plausible so long as the factual content in the complaint "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (noting further that the plaintiff need only "nudge[] his" claims "across the line from the conceivable to the plausible").

Thus, "a Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). "Moreover, when, as here, a defendant seeks dismissal of a civil rights complaint, '[the court] must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears to a certainty that the plaintiff would not be entitled to relief

*under any legal theory which might plausibly be suggested by the facts alleged.'" Presley v. City*

*Of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards*, 178 F.3d at 244)

(emphasis in original).

## II.     Mr. Johnson Properly Pled False Arrest in Violation of the Fourth Amendment (Count I)

Johnson amply alleged that the Agents lacked probable cause and violated his Fourth

Amendment rights in the course of their brutal arrest.  Because this inquiry asks whether a

reasonable officer had probable cause *at the exact moment of arrest*, it is immaterial whether the

Agents possessed reasonable suspicion to stop Martese in the first place.  As is plain from its

allegations, taken in the light most favorable to Johnson, the FAC easily alleges the absence of

probable cause required.

> The Fourth Amendment protects "[t]he right of the people to be secure in their
> persons ... against unreasonable searches and seizures." U.S. Const. amend. IV.
> An arrest is a seizure of the person, and subject to limited exceptions not relevant
> here, the general rule is that "Fourth Amendment seizures are 'reasonable' only if
> based on probable cause."  *Dunaway v. New York*, 442 U.S. 200, 213 (1979).

*Rogers v. Pendleton*, 249 F.3d 279, 290 (4th Cir. 2001).  "Whether probable cause exists in a

particular situation . . . always turns on two factors in combination: the suspect's conduct as

known to the officer, and the contours of the offense thought to be committed by that conduct."

*Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992).  "Probable cause therefore could be lacking

in a given case, and an arrestee's right violated, either because of an arresting officer's

insufficient factual knowledge, or legal misunderstanding, or both." *Id.*  "If a person is arrested

when no reasonable officer could believe, in light of the contours of the offense at issue, that

probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment

right to be arrested only upon probable cause ensues." *Rogers*, 249 F.3d at 290.

Thus, "the appropriate question is whether a reasonable police officer could have

believed that arresting" Mr. Johnson on charges of public intoxication, obstructing justice, and possessing a false identification card "was lawful, in light of clearly established law and the information the officers possessed." *See id.* Consequently, "it is necessary to address the contours of the offense at issue in this case." *Sestito v. DeBrular*, 634 F. Supp. 2d 615, 622 (E.D. Va. 2009) *aff'd in part sub nom. Sestito v. Heirwater*, 378 F. App'x 258 (4th Cir. 2010).

Notably, whether the Agents had probable cause is a deeply fact intensive question, inappropriate for resolution on a motion to dismiss. *See Wadkins v. Arnold*, 214 F.3d 535, 539 (4th Cir. 2000) ("Determining whether the information surrounding an arrest suffices to establish probable cause is an individualized and fact-specific inquiry."); *Safar v. Tingle*, --- F. Supp. 3d ---, 2016 WL 1367165, at *3 (E.D. Va. Apr. 4, 2016) ("[W]hen the facts relating to probable cause are in dispute, there is a question of fact for the jury."), *appeal docketed*, No. 16-1420 (4th Cir. Apr. 13, 2016).

### A. The Agents Did Not Have Probable Cause to Arrest Mr. Johnson for Possessing a Fake Identification Card

It is axiomatic that "[p]robable cause must be supported by more than a mere suspicion . . . ." *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996). Yet here, it is apparent that, at best, the Agents had only a "mere suspicion" that Martese had a fake identification card.

Importantly, *all* that the Agents witnessed was "an individual cordially hand his identification to the bouncers at Trinity, the bouncers cordially return the identification to the individual, and the individual having a cordial conversation with the owner before beginning to walk away." FAC ¶ 27. Indeed, "[n]one of the Agents could hear the conversations that occurred while [Mr. Johnson] was at Trinity" and "they did not know why [he] was denied entry to the bar." FAC ¶ 25. No *reasonable* officer would believe that this simple exchange, without more, constituted probable cause to believe that Martese had just used a false identification card

in seeking to enter Trinity. *See United States v. Dede*, 83 F. App'x 732, 737-38 (6th Cir. 2003) (finding probable cause to arrest one defendant for possession of a false identification after examining the identification card, but concluding that no probable cause existed to arrest a second defendant for possession of a false identification where the officers did not introduce the card into evidence and did not specify why they thought it was inauthentic).

Yet in their Motion, Defendants argue exactly that—that based on *nothing* more than their observations of this simple exchange—"all three Agents could have justifiably stopped and arrested the plaintiff for the misdemeanor possession of a false identification." *See* Doc. No. 50 at 21-22. In so arguing, Defendants ignore the host of other reasons why Mr. Johnson might have been turned away from Trinity. Perhaps the bouncer at the door did not like Mr. Johnson or perhaps he was wearing the wrong type of shoes or an inappropriate hat. Perhaps the establishment was at capacity or perhaps it allowed a specific ratio of women to men that had not been met. In short, Defendants' argument would countenance an arrest based on nothing more than *rank speculation*, but this is *not* the law, and *no* reasonable officer would have supposed it to be. *See, e.g.*, *United States v. Shanklin*, No. 2:12cr162, 2013 WL 6019216, at *8 (E.D. Va. Nov. 13, 2013) (holding that reliance on a "possibility that the computers contain evidence of the exploitation of children [was a] speculation that is insufficient to establish probable cause").[1]

Tellingly, the Agents did not examine Mr. Johnson's identification card or make any attempt to investigate their baseless suspicions before moving to seize Mr. Johnson. *See* FAC ¶¶

---

[1] Defendants argue that "the setting in which the suspected offense occurred is vital." *See* Doc. No. 50 at 23. While this is certainly true, the environment the Agents faced when they seized Mr. Johnson is equally consistent with the alternate possibilities raised above as to why Mr. Johnson might have been turned away from Trinity. Notably, for example, Defendants point out that "the plaintiff waited in a long line to gain entry." *Id.* But this fact makes it just as likely that Mr. Johnson was turned away because Trinity was at capacity, *not* because he possessed a fake identification card.

28-32.  To the contrary, they "did not stop to speak to the owner of or any other bouncers at

Trinity;" or even ask why Mr. Johnson had been turned away.  FAC ¶ 30.  This failure "to avail

[themselves] of readily available information that would have clarified matters" further

highlights that an objectively reasonable officer in the Agents' position would *not* have possessed

probable cause based on the scant information before him.  *See Sevigny v. Dicksey*, 846 F.2d 953,

957 (4th Cir. 1988) (officer acted unreasonably and without probable cause where he did not

make "rudimentary inquiries" of witnesses or "do what any police officer acting reasonably in

the circumstances would have done to clarify the factual situation").[2]

    Nor, construing the facts in the light most favorable to Mr. Johnson, did any subsequent

actions cause any reasonable suspicion to ripen into probable cause.  Notably, Defendants base

this argument on a reading of the facts that is plainly contradicted by Johnson's allegations (*i.e.*,

that after Agent Miller stopped Martese, Mr. Johnson "without saying a word, opposed the stop

by force").  *See* Doc. No. 50 at 25.  To the contrary, the FAC makes it clear that Agent Miller

approached Mr. Johnson from behind "in such a way as to obscure the fact that he was law

enforcement," and that Miller "did not identify himself as law enforcement."  FAC ¶¶ 28-29.

Because of the Agent's actions, Mr. Johnson did not realize that Miller was law enforcement and,

"startled from being grabbed from behind by someone he did not know, instinctively pulled his

arm away and tried to continue walking."  FAC ¶ 31.  The FAC further alleges that, as soon as

---

[2] Defendants argue that it is irrelevant that the Agents did not speak to witnesses before pursuing
Mr. Johnson because the "[r]easonableness of the officer's decision to stop a suspect does not
turn on the availability of less intrusive investigatory techniques."  *See* Doc. No. 50 at 22.  While
this principle of law may be true in the abstract, it does *not* absolve Defendants where, as here,
the information in their possession would *not* have provided a reasonable officer with the
probable cause necessary to arrest.  Moreover, *Sevigny* teaches that an officer must still do a
*reasonable* investigation before finding the existence of probable cause.  *See Sevigny*, 846 F.2d at
957.  Here, the Agents' failure to address even the most obvious leads renders their subsequent
arrest unreasonable.

Mr. Johnson did realize who Miller was, "he began speaking with Miller so as to explain to the Agent that he had done nothing wrong" and attempted "to comply with Miller's order."  FAC ¶ 35.  Viewed in the light most favorable to Mr. Johnson, a reasonable officer would have viewed Mr. Johnson's conduct as a reasonable misunderstanding caused by the agents' own actions, *not* "oppos[ition] . . . by force."  Nor could Mr. Johnson's attempts to comply with the officer's directives be viewed as providing additional evidence of guilt of *any* crime, let alone possession of a fake identification card.[3]

At bottom, viewing the well-plead allegations in the FAC in Mr. Johnson's favor and understanding the contours of the relevant case law, the Agents plainly did *not* have probable cause to arrest Mr. Johnson for possession of a false identification.  *See Rogers*, 249 F.3d at 292.

### B. The Agents Did Not Have Probable Cause to Arrest Mr. Johnson for Obstruction of Justice

Mr. Johnson purportedly was arrested for violating Va. Code Ann. §18.2–460(A), which states that "[i]f any person without just cause knowingly obstructs a . . . law-enforcement officer . . . in the performance of his duties . . . he shall be guilty of a Class 1 misdemeanor."  Obstruction requires "'acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty.'"  *Ruckman v. Commonwealth*, 505 S.E.2d 388, 389 (Va. Ct. App. 1998) (quoting *Jones v. Commonwealth*, 126 S.E. 74, 77 (Va. 1925)).  Importantly, the statute also "requires 'actual hindrance or obstruction of the officer,' 'opposition or resistance by direct action.'"  *Rogers*, 249 F.3d at 291 (internal citations omitted).  "'[O]bstruction of justice does *not* occur when a person fails to cooperate fully with an officer or when the person's conduct merely renders the officer's task more difficult' or 'frustrate[s] [his or her]

---

[3]  Even if Mr. Johnson's allegations could be read as Defendants do (which they *cannot* in the context of a motion to dismiss), the act of instinctively pulling away from an unknown individual who had failed to identify himself says nothing about whether or not Mr. Johnson actually possessed a fake identification.

investigation.'" *Id.* (alteration in original) (emphasis added) (quoting *Ruckman*, 505 S.E.2d at 389, 390).

Here, reviewing the facts as set forth in the FAC, the Agents had no reasonable belief that Mr. Johnson was attempting to obstruct them. As alleged in the FAC, Miller approached Johnson "from behind and grabbed his arm," without identifying himself and "in such a way as to obscure the fact that he was law enforcement." FAC ¶¶ 28-29. As Mr. Johnson was "startled from being grabbed from behind by someone he did know," he "instinctively pulled his arm away and tried to continue walking." FAC ¶ 31. Miller followed Johnson, "and again grabbed his arm, holding his elbow" and, "[f]or the first time . . . demanded to see Martese's 'fake' identification card, while aggressively attempting to twist Martese's arm behind his back." FAC ¶ 28. It was *only* at this point that Mr. Johnson saw his badge and realized Miller was law enforcement. FAC ¶¶ 31, 34. Martese immediately attempted "to cooperate with Agent Miller" by "speaking with [him] so as to explain . . . that he had done nothing wrong and did not possess a fake identification card," and to "comply with Miller's order" by showing him is identification. FAC ¶ 35. Custer then inserted himself into the situation, grabbing Martese's other arm and preventing him from complying with Miller's order. FAC ¶ 36. Mr. Johnson "was not yelling, did not appear intoxicated, and was not aggressive towards the Agents." FAC ¶ 37. Instead, he simply "attempted to cooperate with the agents, comply with their orders, and explain the situation to them." *Id.*; *see also* FAC ¶ 40.

Given these facts, any reasonable officer would have recognized that Mr. Johnson was not attempting to obstruct anything; rather, he continued to try to explain the situation and to show the Agents his valid identification card. Because no reasonable officer could have inferred that Johnson actually intended to prevent Miller from performing his duties, the Agents plainly

lacked probable cause to arrest Martese for obstruction. *See Ruckman*, 505 S.E.2d at 389; *see also Wilson v. Kittoe*, 337 F.3d 392, 399 (4th Cir. 2003) ("[T]o constitute an obstruction . . . there must be acts clearly indicating an intention on the part of the accused *to prevent* the officer from performing his duty . . . .") (emphasis in original).

While Defendants argue that probable cause existed because the plaintiff applied "objective force" and "physical resistance" when "he pulled away and tried to free himself," *see* Doc. No. 50 at 27, this mischaracterizes the facts as actually pled and ignores the objectively apparent reasons for Mr. Johnson's actions. *See Nahigian v. Juno Loudoun, LLC*, 684 F. Supp. 2d 731, 736-37 (E.D. Va. 2010) ("on a motion to dismiss, 'the material allegations of the complaint are taken as admitted,'" and "'the complaint is to be liberally construed in favor of plaintiff'"). In fact, when Mr. Johnson "pulled his arm away" from "someone he did not know," Miller had neither identified himself nor given Martese *any* commands. *See* FAC ¶ 31. No reasonable officer would have believed that Mr. Johnson's initial pulling away from an *unknown* assailant showed any actual intent to impede a law enforcement officer from performing his duties. *See Wilson*, 337 F.3d at 399-400; *see also Ruckman*, 505 S.E.2d at 389 (noting that even "an accused's hiding or seeking 'to escape [an] officer by merely running away [is] not such an obstruction as the law contemplates'") (quoting *Jones*, 126 S.E. at 76) (alteration in original).[4]

Moreover, when Miller finally spoke to Mr. Johnson, he "demanded to see Martese's 'fake' identification card." FAC ¶ 32. Such a request would have required Martese to reach into

---

[4] This distinguishes this case from those cited by Defendants, where even "minor" acts of physicality support an obstruction charge. *See* Doc. No. 50 at 26-27. Those acts, regardless of how minor they are, must still show an intent to actually impede the law enforcement officer in his duties. Here, taking the facts in the light most favorable to Mr. Johnson, a reasonable officer would have known that such an intent was absent, thereby precluding a finding of probable cause for obstruction of justice. *See, e.g.*, *Brown v. Commonwealth*, No. 0770-09-2, 2010 Va. App. LEXIS 20, at *6-7 (Va. App. 2010) (finding obstruction where the defendant pulled his arm from a police officer "*after being advised of his arrest*") (emphasis added).

his pocket to retrieve his identification, and thus, actually envisioned the *exact action* Mr. Johnson tried to take. While Defendants complain that Johnson "attempted to free himself," *see* Doc. No. 50 at 27, Martese "was not yelling, did not appear intoxicated, and was not aggressive towards the Agents" FAC ¶ 37. As such, Mr. Johnson's objectively reasonable attempts to follow the Agent's instructions "did not obstruct the ability of the officers to conduct their planned search," and therefore, could not fall within §18.2-460's ambit. *See Rogers*, 249 F.3d at 291 (finding that the plaintiff's actions in "'stepping in front of [the officer]' and 'getting in his face'" did not constitute obstruction for purposes of a § 1983 false arrest claim because his actions "did not make it difficult or impossible for the officers" to conduct their planned search).

In short, there was simply no probable cause to arrest Mr. Johnson for obstruction of justice, as no reasonable officer would have believed that Martese's attempt to present his identification and explain the situation was intended to or actually did obstruct the Agents. Thus, as in *Rogers*, "because Virginia's obstruction of justice statute clearly fails to encompass [the Agents'] behavior, . . . [Mr. Johnson's] arrest was plainly without probable cause . . . [and] violated his clearly established Fourth Amendment rights." *See Rogers*, 249 F.3d at 292.[5]

### C. The Agents Did Not Have Probable Cause to Arrest Mr. Johnson for Public Intoxication

Defendants also attempt to justify the Agents' warrantless arrest of Mr. Johnson by

---

[5] Defendants' citation to *Martin v. Mendoza*, 230 F. Supp. 2d 665 (D. Md. 2002), is also inapposite. As an initial matter, *Martin* was an opinion on summary judgment, *after* discovery. Moreover, there, the disorderly conduct arrest was actually supported by probable cause, because the plaintiff (1) admitted he "was highly offended by [the officer's] suspicions of him and reacted in such a loud and boisterous manner that [the officer] was required repeatedly to admonish him to 'calm down' as they were in a public place and in the presence of other patrons; and (2) was slow . . . in complying with [the officer's] lawful order that he depart the . . . Metro station after [the officer] reasonably concluded that he would not lower his voice or desist from his continued challenge to the propriety of the initial detention." *Id.* at 671. Here, by contrast, Martese was not loud or aggressive towards the Agents, and tried to comply with Miller's order immediately upon seeing his badge and receiving his instruction. FAC ¶¶ 32-37.

arguing that they possessed probable cause to arrest him for public intoxication in violation of Va. Code §18.2–388. However, a person is "intoxicated" only if he "has drunk enough alcoholic beverages to observably affect his manner, disposition, speech, muscular movement, general appearance or behavior." Va. Code Ann. §4.1–100. As such, probable cause for public intoxication requires signs of "physical impairment caused by alcohol consumption." *United States v. Brown*, 401 F.3d 588, 597 (4th Cir. 2005); *see also Sestito*, 634 F. Supp. 2d at 623 (probable cause cannot be based on agitation, as "mere 'agitation,' without more, is simply not indicative of intoxication").[6]

Here, the FAC is devoid of *any* support for Defendants' contention that the Agents had probable cause to arrest Martese for public intoxication. Indeed, the FAC explicitly alleges that the "three Agents did not see any signs of intoxication while surveilling Martese; nor did the Agents witness Martese conduct himself in a belligerent manner." FAC ¶ 26; *see also* ¶ 37 ("Martese was not yelling, did not appear intoxicated, and was not aggressive towards the Agents.").[7] In fact, the Agents did not hear or investigate the conversation with the bouncer at all. FAC ¶¶ 25-27, 30. Accordingly, given the absence of any signs of intoxication (let alone the actual "physical impairment" required by case law), the Agents could *not* have reasonably believed that they had probable cause to arrest Mr. Johnson for public intoxication. *See Rogers*,

---

[6] While Defendants argue that no requirement exists in Virginia that a person be "physically impaired" in order to be legally intoxicated, *see* Doc. No. 50 at 28, even the case on which Defendants rely "assum[ed] without deciding" that a physical impairment is a requirement for the offense. *See McGhee v. Commonwealth*, 280 Va. 620, 624 (2010). This dicta is insufficient to overrule the Fourth Circuit's holding in *Brown*.

[7] Defendants' assertion that Mr. Johnson's illegally obtained statement is relevant to the probable cause inquiry is erroneous. Doc. No. 50 at 29. The statement was made *after* his arrest, and therefore cannot be the basis for probable cause. *E.g.*, *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) (probable cause must be based on "the facts known to the arresting officer *at the time of the arrest*") (emphasis added).

249 F.3d at 290; *Brown*, 401 F.3d at 597 (holding, because "Brown showed no signs of physical impairment caused by alcohol consumption," that "Officers Lewis and Petrosky lacked probable cause to arrest Brown for public intoxication").

## III.    Mr. Johnson Has Stated an Excessive Force Claim Against the Agents (Count II)

### A.    The *Graham* Factors Weigh Strongly in Favor of Mr. Johnson

The FAC amply demonstrates that the Agents' use of force against Johnson was objectively unreasonable given the circumstances.  In reviewing allegations of excessive force, the officer's actions are analyzed under an "objective reasonableness standard." *Graham v. Connor*, 490 U.S. 386, 388 (1989).  This inquiry "'requires careful attention to the facts and circumstances of each particular case.'" *Jones v. Buchanan*, 325 F.3d 520, 527 (4th Cir. 2003) (quoting *Graham*, 490 U.S. at 396).  "Those facts and circumstances include 'the severity of the crime at issue,' whether the 'suspect poses an immediate threat to the safety of the officers or others,' and whether the suspect 'is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* at 527 (quoting *Graham*, 490 U.S. at 396).  "The extent of the plaintiff's injury is also a relevant consideration." *Id.*    Further, "[t]he objective reasonableness standard is intensely fact-based and [often] cannot be adequately analyzed on a motion to dismiss." *Drake v. Higgins*, No. CIV. A. 97-0143-C, 1998 WL 372641, at *3 (W.D. Va. June 29, 1998).

Here, the facts alleged in the FAC show that all of the objective reasonableness criteria weigh in Martese's favor.  First, as discussed above, no crimes had been committed and the Agents had no probable cause to believe that a crime had been committed.  A plaintiff who is subjected to police force but has committed no crime has "stated a claim for violation of his constitutional right to be free from excessive police force." *Jones*, 325 F.3d at 528.

But, "[e]ven in a case in which the plaintiff had committed a crime, when the 'offense was a minor one,'" the Fourth Circuit has "found that the first *Graham* factor weighed in

plaintiff's favor." *Id.* In particular, a "nonviolent misdemeanor offense [i]s not of the type that would give an officer any reason to believe that [the plaintiff] was a potentially dangerous individual." *Smith v. Ray*, 781 F.3d 95, 102 (4th Cir. 2015) (collecting cases recognizing that misdemeanor offenses such as disobeying a peace officer's orders and driving while intoxicated weigh *against* finding excessive force was justified).

In *Smith*, "at the time [the officer] grabbed [the plaintiff's] arm without explanation, he at most had reason to suspect that she may be guilty of the misdemeanor of contributing to the delinquency of a minor" and the first *Graham* factor weighed against the officer. *Id.* Here, at the moment Miller grabbed Mr. Johnson's arm, he had at best mere suspicion that Mr. Johnson was in possession of a false identification. The nonviolent misdemeanor nature of that offense requires that the first *Graham* factor weigh strongly against the Agents.[8]

Second, no reasonable officer would have believed that Martese posed an immediate threat to the safety of the Agents or others. A key factor in this analysis is whether the plaintiff is armed or suspected of being armed. *See Jones*, 325 F.3d at 528-29 (finding no reasonable threat of safety where plaintiff was not armed or suspected of being armed). More generally, courts consider if the plaintiff gave any indication that he was "at all inclined to cause [the officer] any harm or that []he had any capacity to do so." *Smith*, 781 F.3d at 102. Mr. Johnson was neither armed nor suspected of being armed. FAC ¶ 38. As soon as Johnson realized that Miller was law enforcement (by that time Miller had already begun to twist Martese's right arm behind his back), he attempted to explain the situation and reach for his identification to comply with

---

[8] Notably, Defendants do not even address the nonviolent nature of the offenses in arguing (incorrectly) that the first *Graham* factor weighs against Mr. Johnson. *See* Doc. No. 50 at 31. As *Smith* teaches, this consideration is dispositive in analyzing the first *Graham* factor, regardless of whether the Agents had probable cause to believe that Mr. Johnson had committed those offenses (which they did not). *See Smith*, 781 F.3d at 102.

Miller's order. FAC ¶¶ 35, 37. Martese continued his futile attempt to comply with Miller's

order to produce his identification and to "explain the situation" after Custer approached and

grabbed Mr. Johnson's left arm. FAC ¶ 35-36. Johnson "was not yelling, did not appear

intoxicated, and was not aggressive towards the Agents." FAC ¶ 37. Thus, he gave no indication

he was inclined to harm the Agents or had the capacity to do so.[9] Importantly, the Agents did *not*

face a highly tense situation involving hardened criminals or suspected dangerous criminal

activity. Rather, they approached a college student out with his friends in a low-risk area

immediately adjacent to UVa suspected of nonviolent misdemeanor offenses. The second

*Graham* factor thus weighs strongly against the Agents.

Third, no reasonable officer would have believed that Mr. Johnson was attempting to flee.

While Defendants argue otherwise (by asserting, without any nod to context, that Mr. Johnson

tried to free himself, walk away, and reach into his pocket), *see* Doc. No. 50 at 32, they ignore

the fact that Martese only *instinctively* pulled away after Miller grabbed him from behind without

identifying himself. FAC ¶ 31. This "instinctive[ ] attempt to pull h[im]self from [the Agent's]

grasp" cannot reasonably be considered an attempt to flee. *See Smith*, 781 F.3d at 102-03 ("That

[the plaintiff] instinctively took one step back when [the officer] startled her . . . or that she

pulled her arm from [the officer's] grasp and angrily demanded that he explain himself did not

give [the officer] license to significantly escalate the situation by throwing her down and

---

[9] Defendants' argument that Johnson's actions in "repeatedly attempt[ing] to free himself, pull
away, and reach into his pocket, albeit while subjectively trying to explain that he had done
nothing wrong … *could have* caused a reasonable officer" to act, *see* Doc. No. 50 at 31-32
(emphasis added), again attempts to characterize facts in their favor, rather than construing them
in the light most favorable to Martese. Defendants cannot short-circuit Mr. Johnson's right to
have a jury decide whether the officers' actions were reasonable simply by characterizing the
facts pled as "subjective." *See Smith*, 781 F.3d at 103 ("Even assuming *arguendo* that [the
officer] might have reasonably perceived [the plaintiff] as attempting to flee … [a] reasonable
jury could find that at that moment, any perception by [the officer] that [the plaintiff] had
attempted or was attempting to flee would have been unreasonable.").

jumping on her, as any reasonable officer would have known."); *see also Rowland v. Perry*, 41 F.3d 167, 172, 174 (4th Cir. 1994) (finding third *Graham* factor weighed against officer where plaintiff alleged officer grabbed his collar from behind and plaintiff instinctively pulled away).

Moreover, read in context as a whole, Mr. Johnson's attempts to "free himself" from the Agents' grasp and reach into his pocket were *so that he could comply with Miller's order*.  FAC ¶¶ 35, 37.  The fact that Martese tried to comply with Miller's order (once he realized that Miller was law enforcement)[10] *but could not* (because he was being physically restrained) does *not* show any attempt by Johnson to flee from law enforcement.  *See Smith*, 781 F.3d at 103 (rejecting a "'segmented' approach" in holding that a reasonable officer could *not* "believe that [the plaintiff's] initial act of pulling her arm away when [the officer] grabbed her without warning or explanation justified [the officer's] decision to throw her down, jam his leg in her back, and wrench her arm behind her").

Similarly, Defendants' reference to Mr. Johnson's writhing on the ground in pain is a *non sequitur*—at that point Johnson had been slammed to the ground by the Agents and had suffered a severe injury with blood gushing down his face.  FAC ¶¶ 41-43.[11]  Martese's slight movements due to his tremendous pain cannot justify the Agents' brutal actions, and it is disappointing that Defendants would resort to such an argument.  *See Jones*, 325 F.3d at 530 ("Deputy Keller also cannot justify his actions based on Jones's slight physical movement—simply beginning to stand up 'just a little bit' while in handcuffs in an effort (according to Jones) to bring the handcuffs to

---

[10] Miller never identified himself as law enforcement throughout the encounter. FAC ¶ 34.

[11] Defendants' argument that Martese's "subjective assessment that he was 'grabbed' and 'slammed' down is not supported by any objective facts," *see* Doc. No. 50 at 32, is also improper on a motion to dismiss.  *See Nahigian*, 684 F. Supp. 2d at 736-37.  Defendants' attempt to argue the facts must be rejected.  *See Smith*, 781 F.3d at 105 ("To the extent [the officer] takes the position that he believed on those facts that [the plaintiff] had a weapon, a reasonable jury could have concluded that this perception was unreasonable.").

the front of his body in order to alleviate breathing problems . . . .").[12]  For all of these reasons,

the third *Graham* factor weighs heavily against the Agents.

Finally, the level of force the Agents used caused Mr. Johnson's severe injuries—Martese

suffered severe facial and other lacerations that bled profusely and required ten stitches, along

with facial swelling, and bruising along his torso and arms.  FAC ¶¶ 40, 52.  The severity of the

injury often demonstrates that the plaintiff has established his excessive force claim.  *See Jones*,

325 F.3d at 530-31 (broken nose, facial lacerations, and bruised ribs weighed in favor of

establishing excessive force claim); *Rowland*, 41 F.3d at 174 (severity of injury coupled with

totality of circumstances showed denial of summary judgment on qualified immunity was

proper).

Accordingly, as the *Graham* factors all weigh *against* finding that the Agents' conduct

was objectively reasonable, and considering the severity of Mr. Johnson's injuries, the Court

should permit Martese's excessive force claim to proceed.  *See, e.g.*, *Smith*, 781 F.3d at 104

(affirming denial of summary judgment on excessive force claim where "the officer took a

situation where there obviously was no need for the use of any significant force and yet took an

unreasonably aggressive tack that quickly escalated it to a violent exchange when the suspect

instinctively attempted to defend himself"); *Guerrero v. Deane*, No. 1:09cv1313 (JCC/TRJ),

2010 WL 670089, at *12 (E.D. Va. Feb. 19, 2010) (finding excessive force claim should go

forward where two of the three *Graham* factors outweighed the fact that the officer "may have

---

[12] Defendants' citation to *Dunn v. Vanmeter*, No. 5:09-CV-00085, 2010 WL 3154972 (W.D. Va. Aug. 9, 2010)—a case decided on summary judgment—is likewise inapposite.  There, the plaintiff's actions in attempting to enter his house (where there might have been weapons or other contraband) after being informed that he was under arrest, and after he continued to struggle against the officers, allowed a reasonable officer to believe that the plaintiff had been resisting or evading arrest.  *See id.* at *5.  Because Martese's actions in this case do not give rise to a similar belief, the third *Graham* factor also weighs against the Agents.

[had] a plausible argument that Mrs. Guerrero resisted arrest").

**B.      Agent Cielakie Engaged in Excessive Force**

Martese's claims regarding Cielakie's excessive force are properly encompassed in his excessive force claim.  In asserting that his claim against Cielakie fails because handcuffing is not excessive force, Defendants ignore the FAC's well-pleaded allegations, which show that Mr. Johnson was not "actively resisting arrest."  Given that fact, there would have been *no* need for Cielakie, who had been watching the entire encounter, to "roughly and aggressively handcuff Martese's right hand" and "unnecessarily shackle[ ] Martese's legs together."  FAC ¶¶ 45-49. Viewed as a whole in context, the question of Cielakie's use of force cannot be resolved on a motion to dismiss. *See Smith*, 781 F.3d at 103 n.5 (finding that "hair pulling was only a part of the force [the officer] utilized here in the course of arresting Smith"); *Guerrero*, 2010 WL 670089, at *12 (finding allegations that "Officer Moore allegedly ordered a female officer, Officer ROE, to tighten Mrs. Guerrero's handcuffs, and she complied, even though Mrs. Guerrero never attempted to escape the squad car" sufficient to state a claim for excessive force against Officer ROE).

**IV.     The FAC States a Claim for Bystander Liability Against Cielakie (Counts I & II)**

Because Agent Cielakie observed and had every opportunity to stop the other Agents' constitutional violations, but chose not to act, the FAC states a claim for bystander liability for both false arrest and probable cause.[13]  "The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them."  *Randall v. Prince George's County, Md.*, 302 F.3d 188, 203 (4th Cir. 2002). "Therefore, if a bystanding officer (1) is confronted with a fellow officer's illegal act, (2)

---

[13] Because the standard for assessing bystander liability is the same regardless of which Fourth Amendment violation occurred, Mr. Johnson analyzes his pleading of bystander liability for both Counts I and II together.

possessed the power to prevent it, and (3) chooses not to act, he may be deemed an accomplice and treated accordingly." *Id.*

Here, the FAC alleges that Agent Cielakie "was in close proximity to Miller, Custer, and Martese," and that he "had clear line of sight to the group and, on information and belief heard their conversation." FAC ¶¶ 45, 78, 96. Moreover, "[o]n information and belief, Cielakie witnessed the entire unconstitutional detention and excessive force against Martese by Agents Miller and Custer." FAC ¶ 46, 78, 96. As detailed throughout the FAC, this would include (1) sneaking up behind an unsuspecting Martese and grabbing his arm without saying a word, investigating the situation, or identifying himself as law enforcement; (2) again grabbing Johnson and "aggressively attempting to twist [his] arm behind his back," still without identifying himself or using any de-escalation procedures or other techniques; (3) working with another officer to grab Martese and prevent him from complying with their orders, while Mr. Johnson tried only to cooperate with the officers and prove his innocence; and (4) "slamm[ing]" Mr. Johnson into a brick walkway, face first, "all of a sudden, and without provocation." *See* FAC ¶¶ 24-42. Cielakie observed all of this misconduct with full awareness of the lack of investigation performed by any of the Agents and understanding that "Martese was not yelling, did not appear intoxicated, and was not aggressive toward the Agents. Instead he attempted to cooperate with the agents, comply with their orders and explain the situation to them." FAC ¶ 37. As explained *supra*, and viewing the facts in the light most favorable to Johnson, any reasonable officer in Cielakie's position would have understood that the other Agents were effecting an unlawful arrest and using excessive force against Mr. Johnson. *See* FAC ¶¶ 79, 97.

Yet, despite his knowledge, "proximity to and observation of the other Agents' unprovoked, violent, and unnecessary actions, [Cielakie] did nothing to intervene or to try and

prevent them from injuring Martese." FAC ¶¶ 46, 80-81, 98-99 ("Given Cielakie's close proximity to Martese and view of the entire encounter, Cielakie had a reasonable opportunity to prevent Martese's unconstitutional use of force [and arrest]" but "chose not to act"). "To the contrary, ABC Agent Cielakie joined Custer and Miller, and roughly and aggressively handcuffed Martese's right hand with a second set of handcuffs and connected the two pairs behind Martese's back." FAC ¶¶ 47, 81, 99. Cielakie then "unnecessarily shackled Martese's legs together without sufficient provocation." FAC ¶ 49. These facts, taken together, sufficiently allege the knowledge, opportunity, and choice required for bystander liability. *See, e.g.*, *Chavez v. McIntyre*, 424 F. Supp. 2d 858, 862 (W.D. Va. 2006) (Conrad, J.) (finding sufficient to allege bystander liability allegations that "[d]efendants … had opportunities to intercede on behalf of Mr. Chavez to prevent the excessive use of force and the unreasonable seizure but due to their intentional conduct or deliberate indifference declined or refuse[d] to do so"); *Smith v. Taylor*, No. 7:14CV00002, 2015 WL 1194131, at *6 (W.D. Va. Mar. 16, 2015) (Conrad, C.J.) (bystander liability claim survived summary judgment where the officer "must have observed" the "unnecessary use of physical force" but refused to intervene).

Defendants' arguments to the contrary are based on the same characterizations of facts (without reference to context and without taking them in the light most favorable to Mr. Johnson) that they use in arguing for dismissal on direct liability for false arrest and excessive force. Thus, for the same reasons those arguments fail, so too do Defendants' arguments here. *See* Doc. No. 50 at 29-30, 33-34. Likewise, Defendants' argument that "Agent Cielakie had no time to stop the very gravamen of the plaintiff's excessive force claim," *see* Doc. No. 50 at 33-34, ignores both (a) the fact that the Agents' excessive use of force began the moment they grabbed Mr. Johnson

from behind without provocation or announcement,[14] and (b) that the question of Agent Cielakie's ability to stop the offense, given his proximity, is one for the jury. *See Donohue v. Lambert*, No. 7:13CV00397, 2015 WL 9582705, at *2 (W.D. Va. Dec. 31, 2015) (Conrad, C.J.) (holding, despite the argument that the excessive force at issue only lasted 15 seconds, that "issues of material fact remain as to whether the following officers had a reasonable opportunity to prevent harm to [the plaintiff] during his decontamination in the shower, based on their physical location and/or their rank and job responsibilities"). Accordingly, the Court should deny Defendants' Motion to Dismiss as to bystander liability.

## V. Mr. Johnson Has Stated a §1983 Failure to Train or Supervise Claim Against ABC (Count III)

As ABC is a self-funding, autonomous entity, FAC ¶ 11, it is *not* entitled to Eleventh Amendment Immunity and is thus a "person" under 42 U.S.C. §1983, subject to liability on Mr. Johnson's failure to train or supervise claim (a "*Monell*" claim).

### A. As A Self-Funding, Autonomous Entity, ABC Is Not Immune Under the Eleventh Amendment

Because a self-funding, autonomous entity is not an "arm of the state" entitled to Eleventh Amendment immunity, Mr. Johnson properly stated a claim against ABC. In determining whether an entity is an arm of the state for Eleventh Amendment purposes, "the most important factor is whether the state treasury will pay any resulting judgment." *Harter v. Vernon*, 101 F.3d 334, 338 (4th Cir. 1996). The other factors are "whether the entity exercises a significant degree of autonomy from the state, whether it is involved with local versus statewide concerns, and how it is treated as a matter of State law." *Id.* at 340 (quoting *Ram Ditta v. Md. Nat'l Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987)). Analyzing the factors

---

[14] This also answers Defendants' argument regarding whether the Fourth or Fourteenth Amendment applies to this claim. *See* Doc. No. 50 at 34 n.12.

under the proper framework, ABC is subject to suit by Mr. Johnson.

In an analogous case, the Fourth Circuit ruled that where an entity is self-funded, the first, and most critical factor, "weighs heavily against" finding it an arm of the state. *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 138-39 (4th Cir. 2014). *C.f. DeBauche v. Va. Commw. Univ.*, 7 F. Supp. 2d 718, 722 (E.D. Va. 1998) *aff'd sub nom. DeBauche v. Trani*, 191 F.3d 499 (4th Cir. 1999) (finding judgment paid by university would come out of state treasury where the state treasury "is a major source of funds for the university."). In *Oberg*, in reviewing a decision on a motion to dismiss, the court assessed whether the Pennsylvania Higher Education Assistance Program ("PHEAA") was an arm of the state and thus entitled to immunity. In analyzing the first factor, the court recognized that "PHEAA's substantial 'moneys' derive exclusively from its own operations," and that its funds were available to the agency to be utilized by the board of directors for carrying out the purposes of the agency. *Oberg*, 745 F.3d at 138. Thus, because any judgment would not be paid from the state's treasury, the first factor weighed against a finding of state immunity. *See id.*

Here, Johnson alleges that ABC "is funded solely through its own revenues." FAC ¶11. Section 4.1-116 of the Virginia Code, addressing the disposition of ABC's moneys, further supports this conclusion. All moneys collected by ABC "shall be set aside as and constitute an Enterprise Fund" for payment of salaries and all other costs and expenses associated with ABC's administration. *Id.* That section further vests ABC with the power to place a certain amount of its profits into a reserve fund to be used "in connection with the administration" of ABC; thus the funds are available to ABC for purposes of carrying out its functions. *Id.* Defendants' contention that ABC's funds are deposited into the state treasury, while true, is irrelevant. *See* Doc. No. 50 at 12. While its funds are deposited into the treasury, they are kept separate, and

when "funds are held in a segregated account apart from general state funds . . . such an arrangement counsels against establishing arm-of-the-state status under this factor." *Oberg*, 745 F.3d at 138-39.[15] Accordingly, the first and most important factor shows that ABC is *not* an arm of the state, as any judgment will be paid out of ABC's own revenue, rather than the state's treasury. *See id.* at 141 (finding that this "critical (albeit not dispositive) first factor weigh[ed] against arm-of-the-state status for [a Vermont agency]" where no statutes existed that rendered Vermont "legally or functionally liable for a judgment").[16]

The second factor, autonomy from the state, further weighs against finding that ABC is an arm of the state. *Oberg* is again instructive. There, the court recognized that PHEAA was financially independent, had the authority to contract, purchase and sell property in its own name, sue and be sued, and control its funds. *Id.* at 139. Thus, even though the board was comprised of gubernatorial appointees as well as state legislators or officials and even though state officials had some degree of veto power over its actions, on balance, and "consider[ing] all reasonable inferences in favor of the plaintiff as [the court] must at this stage," the autonomy

---

[15] Defendants' reliance on *Oberg's* analysis of the ASLA misses the mark. In *Oberg*, the court found that the first factor favored the state only because Arkansas provided ASLA with "substantial funding" and because state statutes actually indicated "that state revenues would be used to satisfy a judgment against ASLA." *See Oberg*, 745 F.3d at 143-44. Here, no Virginia statutes actually indicate that Virginia would be responsible for a judgment against the ABC and Virginia provides little to no separate funding to it. The Fourth Circuit's analysis shows that the dispositive question is <u>where</u> the entity's funding comes from, and because the ABC is self-funded with funds segregated from the rest of the treasury, Virginia is *not* functionally liable for ABC's debts. *See id.* (noting the difference between Arkansas's law, which "carefully cabins ASLA's use of those state revenues to certain lending costs" and Pennsylvania's scheme, which "grant[ed] PHEAA 'discretion[ary] authority to use its funds for any corporate purpose'").

[16] Even if the Court finds it is unclear whether the state would be liable for a judgment, this issue is inapt for resolution on a motion to dismiss. *See Oberg*, 745 F.3d at 141 (ruling that while unclear whether Vermont would be liable for a judgment against the Vermont Student Assistance Corporation ("VSAC"), "we must construe all facts in the light most favorable to the plaintiff, so we assume that this critical (albeit not dispositive) first factor weighs against arm-of-the-state status").

analysis counseled *against* finding PHEAA an arm of the state.  *Id.*; *see also id.* at 141-42

(finding second factor weighed against finding VSAC an arm of the state "as a matter of law"

where the board was (1) "broadly empowered to adopt policies and regulations governing its

lending activities" and (2) was financially independent, and exercised corporate powers, even

though Vermont had "important oversight authority over VSAC" and the majority of the board

consisted of state officers or gubernatorial appointees); *Harter*, 101 F.3d at 341 (finding

"significant autonomy" where sheriff had freedom "to hire, discharge, and supervise the

employees in his office").

Here, Johnson alleges that "ABC is run by a board which directs all agency operations,

including promulgating its own regulations and appointing all employees of ABC."  FAC ¶11.

Indeed, statutory provisions vest ABC with broad authority and autonomy.  Aside from being

self-funding and controlling its funds, ABC can, among other things, (1) lease land, (2) purchase

"any plant or equipment," (3) "appoint every agent and employee required for its operations," (4)

issue subpoenas and "hold and conduct hearings," (5) "promulgate regulations," (6) "assess and

collect civil penalties and civil charges for violations," and (7) "do all acts necessary and

advisable to carry out the purposes of this title."  Va. Code Ann. §4.1-103.  Tellingly, ABC's

"power to regulate shall be broadly construed."  Va. Code Ann. §4.1-111.

Based on this statutory scheme, ABC exercises a significant degree of autonomy from the

state.  Under *Oberg*, such broad, encompassing powers outweigh the few indicia of state control

on which Defendants rely, such as the Governor's ability to appoint and remove board members,

the Attorney General's representation of ABC in legal matters, and the fact that ABC may not be

sued in its own name.  Doc. No. 50 at 12-13.  Indeed, while ABC seeks to parse specific statutes

to provide the appearance of dependence, Virginia's statutory scheme, when viewed as a whole,

shows the broad power vested in the ABC to control almost every facet of its operation. *See Oberg*, 745 F.3d at 142 ("Thus, although we recognize that certain facts relevant to the autonomy analysis suggest that VSAC is an arm of the state, others weigh decidedly against that conclusion . . . . we believe that this factor also counsels against holding as a matter of law that VSAC is an arm of the state."). Consequently, the second factor weighs *against* finding that ABC is an arm of the state.

The third factor, involvement with statewide, as opposed to local, concerns, shows that ABC's activities are both at the local and state level. ABC has the power to determine "the localities within which" liquor stores will be established "and the location of such stores." Va. Code Ann. §4.1-103; *see also* §4.1-119 (ABC establishes stores for the sale of alcoholic beverages "in such counties, cities, and towns" as it finds advisable). Moreover, various statutory provisions address local referenda for the sale of alcoholic beverages, a local activity with which ABC is involved. *See* Va. Code Ann. §4.1-121 – 129. Thus, there are sufficient indicia of ABC's involvement with local matters that this issue cannot be resolved on a motion to dismiss. *See Oberg*, 745 F.3d at 141.

Finally, ABC is treated independently as a matter of state law. ABC is exempted from the Virginia Public Procurement Act, Va. Code. Ann. §2.2-4300, *et. seq.*, which pertains to "governmental procurement from nongovernmental sources." Va. Code Ann. § 4.1-104. This exemption suggests that ABC is treated as separate from the state. The extensive autonomy afforded ABC supports this conclusion. *See Harter*, 101 F.3d at 343 (level of autonomy is relevant to fourth factor). In short, the relevant factors compel a conclusion that ABC is *not* an arm of the state and thus *not* immune under the Eleventh Amendment.[17]

---

[17] Should the Court find that the third and fourth factors are less clear as to whether ABC is an

At a minimum, given Mr. Johnson's allegations that ABC is "funded solely through its own revenues" and "is run by a board which directs all agency operations, including promulgating its own regulations and appointing all employees of ABC," FAC ¶11, resolution of this issue is premature. *Lamb v. Tenth Judicial Dist. Drug Task Force*, 944 F. Supp. 2d 586 (E.D. Tenn. 2013) is an apt example. In *Lamb*, the plaintiff brought §1983 claims against the Tenth Judicial District Drug Task Force ("DTF"), which defendants claimed was a state entity immune under the Eleventh Amendment. *Id.* at 549. The court rejected this position, as the plaintiff alleged "that the DTF is 'self-financing' and establishes its own rules and regulations. The complaint also notes it is governed by a Board of Directors." *Id.* at 593-94. Thus, whether DTF was entitled to Eleventh Amendment immunity could not be decided on a motion to dismiss as, given the facts alleged, determination of the issue required "consideration of materials beyond the face of the complaint." *Id.* at 593-94.[18]

While Defendants rely heavily on *Dance v. City of Richmond Police Dep't*, No. CIV.A.3:09-CV-423-HE, 2009 WL 2877152 (E.D. Va. Sept. 2, 2009), that case is inapposite. There, the plaintiff did *not* allege that ABC is self-funded or that ABC is autonomous. *See*

---

arm of the state (which it should not), Mr. Johnson respectfully submits that the strength of the first two factors require, at this early stage, the Court to conclude that ABC is *not* an arm of the state. *See Oberg*, 745 F.3d at 140-41 ("In sum, although the third and fourth factors suggest that PHEAA is an arm of the state, the first (strongly) and second (albeit less strongly) point in the opposite direction. At this early stage, construing the facts in the light most favorable to the plaintiff we must conclude that Dr. Oberg has alleged sufficient facts that PHEAA is not an arm of the state").

[18] While Defendants argue that "resolution of this immunity question at this early stage is critical," *see* Doc. No. 50 at 14, the Fourth Circuit in *Oberg* implicitly rejected such an argument by finding that, in close cases, an arm-of-the-state analysis *cannot* be decided on a motion to dismiss. *See Oberg*, 745 F.3d at 142 ("We recognize that some of Dr. Oberg's allegations test the outer bounds of the plausibility standard, but at this juncture, we must construe all facts in the light most favorable to the plaintiff. We therefore vacate the judgment of the district court with respect to VSAC and remand to permit limited discovery on this question.").

*Dance* Complaint, attached as **Exhibit A**.[19]  Thus, because the plaintiff there did not fully present

the Court with relevant facts as to the nature of ABC (or the relevant case law), the Court did not

have the opportunity to consider the arguments presented here in its Eleventh Amendment

analysis.  *See Harter*, 101 F.3d at 342 (rejecting defendant's proffered state court holdings as

"there is no reasoning provided for [either] court[s'] conclusion") (alteration in original).  Under

applicable law, and construing all inferences in Mr. Johnson's favor, ABC is *not* an arm of the

state and Johnson's *Monell* claim should proceed.

> **B.      As ABC is Not an Arm of the State, It is a "Person" Under §1983**

Defendants' assertion that regardless of Eleventh Amendment immunity, ABC is not

subject to an action under §1983 is misguided.  It is settled that "[t]he Eleventh Amendment is a

bar to the jurisdiction of a federal court, and as such, it precedes the statutory question of

'personhood' under §1983. Once the Eleventh Amendment inquiry is complete, there is no need

to consider 'personhood.'"  *Harter*, 101 F.3d at 338.  Thus, "[i]f an official or entity is not

immune from suit under the Eleventh Amendment that official or entity is a 'person' subject to

suit under §1983."  *Id.* (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989)

(while states and state entities as not "persons" subject to suit under §1983, this "applies only to

States or governmental entities that are considered 'arms of the State' for Eleventh Amendment

purposes")).  As set forth in detail above, construing the well-pleaded facts in Mr. Johnson's

favor, ABC is not an "arm of the state" and is therefore a "person" subject to suit under §1983.

> **VI.    Mr. Johnson Has Alleged Sufficient Facts to State a Plausible Claim for Failure to
> Train or Supervise (Count III)**

As Martese has alleged specific facts showing (1) knowledge of ABC agents' widespread

---

[19] Mr. Johnson respectfully requests that the Court take judicial notice of the *Dance* complaint,
which is a publicly filed document.  *See Witthohn v. Fed. Ins. Co.*, 164 F. App'x 395, 397 (4th
Cir. 2006) (court may take judicial notice of court filings in deciding a motion to dismiss).

use of excessive force, (2) ABC and Walker's failure to properly train the agents or change the relevant policies, customs, or practices, and (3) their perpetuation of such conduct, Mr. Johnson properly alleges his *Monell* claim. A *Monell* claim is properly stated by alleging

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Here, Johnson alleges that "ABC agents have a history of aggressive, excessive, and unjustified behavior in effectuating their duties," and that the relevant Defendants "had specific knowledge of the policy, custom, or widespread practice of ABC officers' use of unreasonable, disproportionate, and wrongful force and tactics in approaching suspects," highlighted by specific failings, such as the failure to train agents to deploy an appropriate and proportionate level of force. FAC ¶¶ 59, 62, 104, 109. Mr. Johnson then alleges that this conduct "stems from and is caused by a systemic failure to train and supervise agents by Defendants ABC and Walker," and despite their specific knowledge, Defendants "failed to change this policy, custom, or widespread practice." FAC ¶¶ 104, 107-08. Rather, through "policies, discussions and advancement decisions, [they] perpetuated, reinforced, and sanctioned such practices." *Id.* Moreover, Johnson points to a specific incident in April 2013 involving another UVa student (also suspected of a nonviolent misdemeanor) against whom ABC agents deployed excessive force and wrongful tactics, as well as "others that Plaintiff believes to have occurred," as factual support for Defendants' knowledge. FAC ¶¶ 105-09. Finally, their "failures were the moving force behind [the Agents'] wrongful, negligent and/or reckless seizure and assault on Martese."

FAC ¶ 112.

Under *Stroud*, these allegations state a claim for failure to train or supervise, particularly when bolstered by Johnson's specific reference to another instance of ABC agents engaging in constitutional violations. *See Owens v. Balt. City State's Attorneys Office,* 767 F.3d 379, 403 (4th Cir. 2014) (holding allegations of "reported and unreported cases from the period of time before and during the events complained of establish that the [defendant] had a custom, policy, or practice of knowingly and repeatedly" violating constitutional rights); *Moody v. City of Newport News, Va.*, 93 F. Supp. 3d 516, 535 (E.D. Va. 2015) (finding allegations regarding police department's routine failure to investigate excessive force claims sufficient to state a *Monell* claim where general allegations regarding failures were "enhanced" with a specific example of *one* similar incident seven years prior).

Despite Defendants' arguments to the contrary, these are factual allegations, which support Mr. Johnson's *Monell* claim. Indeed, Mr. Johnson is only required to state a claim that is plausible on its face; "establishing the factual nexus" is the purpose of discovery. *See Edwards*, 178 F.3d at 245 (noting in order to survive dismissal on *Monell* claim, a plaintiff "is not required under Rule 8(a)(2) to 'detail the facts underlying his claims,' or 'plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation'") (quoting *Jordan v. Jackson*, 15 F.3d 333, 339 (4th Cir. 1994)); *see also Global Bankcard Servs., Inc. v. Global Merch. Servs., Inc.*, No. 1:11-cv-00110 (IDD), 2011 WL 2268057, at *4 (E.D. Va. June 7, 2011) ("Even under the *Iqbal* standard . . . Rule 8 is still a notice pleading provision and a party's allegations need not be put to proof at the pleading stage."). As such, Defendants' attempt to minimize Mr. Johnson's reference to the April 2013 incident is unavailing. *See Moody*, 93 F. Supp. 3d at 535 (finding a specific reference to

*one similar incident* seven years prior provided sufficient facts to survive a motion to dismiss).

The Fourth Circuit's recent decision in *Owens* is particularly instructive on this point. There, the plaintiff pled its allegations of pervasive conduct generally, without discussing any specific incidents. *See Owens*, 767 F.3d at 403.[20]  In rejecting the Defendants' argument that these allegations were "nothing more than 'unadorned, the-defendant-unlawfully-harmed-me accusation[s],'" the court found that "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Id.*[21]  The court reiterated that "[t]he recitation of facts need not be particularly detailed, and the chance of success need not be particularly high." *Id.*  Thus, while the court recognized that "courts have dismissed *Monell* claims when the plaintiff has alleged nothing more than a municipality's adherence to an impermissible custom," the Court found that the plaintiff had "done more than that: [he] had alleged facts—the existence of 'reported and unreported cases' and numerous 'successful motions'—which, if true, would buttress his legal conclusion." *Id.* The Fourth Circuit noted that "to prevail on the merits, Owens will have to do more than *allege* a pervasive practice of BCPD misconduct; he must *prove* it." *Id.* at 404 (emphasis in original).  But, just as here, the Court found that, "at this early stage in the proceedings, . . . Owens has pled sufficient factual content to survive Rule 12(b)(6) dismissal." *Id.*

Notably, Defendants ignore this critical distinction between pleading standards and evidence required to prevail at trial, as all of the Fourth Circuit cases they cite are appeals from

---

[20] Specifically, the plaintiff alleged that "'[r]eported and unreported cases from the period of time before and during the events complained of' establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions" and that "a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it." *Id.*

[21] The court also specifically noted that "[s]poradic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *See id.*

decisions after discovery, on summary judgment, after an evidentiary hearing, or after trial.  *See*

*Carter v. Morris*, 164 F.3d 215, 217 (4th Cir. 1999) (appeal from grant of summary judgment);

*Shaw*, 13 F.3d at 797 (addressing denial of summary judgment on supervisory liability claim);

*Hughes v. Halifax Cnty. Sch. Bd.*, 855 F.2d 183, 184 (4th Cir. 1988) (challenging directed verdict

on supervisory liability claim); *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984) (addressing

jury's finding of supervisory liability); *Orpiano v. Johnson*, 632 F.2d 1096, 1101 (4th Cir. 1980)

(appeal from after evidentiary hearing and findings of fact and conclusions of law by Magistrate

Judge in habeas action).[22]  Each of these cases addresses the plaintiff's *burden of proof, not*

*burden of pleading*.  In fact, one of the very cases Defendants cite recognizes that the question of

supervisory liability "is ordinarily one of fact, not law," and thus ill-suited for disposition on a

motion to dismiss.  *See Shaw*, 13 F.3d at 799.

Defendants also incorrectly argue that Walker cannot be liable for failure to train and

supervise because Walker was not present or personally involved with Johnson's brutal,

unlawful arrest and his lack of physical proximity to Trinity.  Doc. No. 50 at 16.  It does not

matter that Walker was not present on the night his agents assaulted Martese.  Nor does Mr.

Johnson need to allege that Walker had knowledge about his agents' unlawful practices at the

Corner specifically.  Rather, as alleged, Walker had knowledge about the widespread unlawful

and excessive practices of his agents, particularly with respect to those (wrongfully) suspected of

nonviolent, misdemeanor offenses.  This is sufficient to state a claim for failure to supervise or

train.  *See Owens*, 767 F.3d at 403; *Moody*, 93 F. Supp. 3d at 535.  Accordingly, Mr. Johnson has

---

[22] *Caldwell v. Green*, 451 F. Supp. 2d 811 (W.D. Va. 2006), the sole case Defendants cite that
adjudicated a motion to dismiss, is inapplicable.  There, the court dismissed the *Monell* claim
because the court found no constitutional violations were properly alleged against the deputy;
thus the *Monell* claim against the supervisor also failed.  *Id.* at 821.  As Mr. Johnson has amply
alleged sufficient constitutional claims against the Agents, *Caldwell* is inapplicable.

sufficiently alleged his *Monell* claim against Walker and ABC, and Defendants' Motion should be denied.

## VII. Defendants Are Not Entitled to Qualified Immunity as Their Conduct Clearly Violated Mr. Johnson's Well-Established Constitutional Rights and Was Unreasonable

Public officials are entitled to qualified immunity on constitutional claims only if "their conduct does not violate clearly established statutory or constitutional rights within the knowledge of a reasonable person." *Meyers v. Balt. Cnty., Md.*, 713 F.3d 723, 731 (4th Cir. 2013). "To establish a qualified-immunity defense, a public official must demonstrate that (1) a plaintiff has not alleged or shown facts that 'make out a violation of a constitutional right,' or that (2) 'the right at issue was [not] 'clearly established' at the time of" its alleged violation." *Owens*, 767 F.3d at 395-96 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).

Importantly, the Fourth Circuit has made it clear that, while "[a] qualified immunity defense can be presented in a Rule 12(b)(6) motion . . . when asserted at this early stage in the proceedings, 'the defense faces a formidable hurdle' and 'is usually not successful.'" *Id.* (quoting *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 191–92 (2d Cir. 2006)). Rather, qualified immunity is better decided on a more fulsome record. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005). Further, "[t]he burden of proof and persuasion with respect to a defense of qualified immunity rests on the official asserting that defense." *Meyers*, 713 F.3d at 731. Critically, "under either prong [of the qualified immunity analysis], courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment [or dismissal]." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014)). As such, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions." *Id.*

As set forth below, the Agents and Walker are not entitled to qualified immunity on any of Mr. Johnson's claims, as the FAC amply alleges that their conduct was unreasonable and a

clear violation of Mr. Johnson's rights. At a minimum, their claimed entitlement to qualified immunity is based on their arguing the facts, and thus cannot be resolved on a motion to dismiss.

### A. The Agents Are Not Entitled to Qualified Immunity on Mr. Johnson's False Arrest Claim

As set forth in detail *supra*, Johnson has more than sufficiently alleged that the Agents were without probable cause to arrest him, as the facts stated in the FAC show that Martese did nothing to lead the Agents to reasonably believe that a crime was being committed. *See* FAC ¶¶ 20-43. Further, the right to be free from unreasonable seizures and arrests "has been clearly established constitutional law for decades." *Harrison v. Prince William Cnty. Police Dep't*, 640 F. Supp. 2d 688, 702 (E.D. Va. 2009). Likewise, "[i]f a person is arrested when no reasonable officer could believe, in light of the contours of the offense at issue, that probable cause exists to arrest that person, a violation of a clearly established Fourth Amendment right to be arrested only upon probable cause ensues." *Rogers*, 249 F. 3d at 290.

Tellingly, Defendants do not dispute that this is a clearly established right. Rather, their short and conclusory argument rises and falls on disputed facts. But by arguing that "arguable probable cause" existed on this Motion to Dismiss, *see* Doc. No. 50 at 39, Defendants fail to recognize that, absent undisputed facts, a *jury* has the right to determine what a reasonable officer would have believed. *See Smith*, 781 F.3d at 103 (noting that "on appeal of grant of summary judgment on basis of qualified immunity, . . . [a] court must draw inferences in favor of plaintiff where officers' testimony concerning what they perceived was at odds with testimony of other witnesses . . . .") (citing *Tolan*, 134 S. Ct. at 1866-68). As set forth above in detail, and as alleged in the FAC, taking all facts in the light most favorable to Mr. Johnson, the Agents were completely lacking probable cause to arrest him. Thus, no reasonable officer could have believed that their conduct was lawful, and the Agents are *not* entitled to qualified immunity.

**B.    The Agents Are Not Entitled to Qualified Immunity on Mr. Johnson's Excessive Force Claim**

The Agents do not, because they cannot, dispute that on the night of Mr. Johnson's unlawful arrest it "was surely clear that arrestees had a general constitutional right to be free from the use of excessive force by police officers." *Shaw*, 13 F.3d at 802; *see also Tolan*, 134 S. Ct. at 1865 ("When a plaintiff alleges excessive force during an investigation or arrest, the federal right at issue is the Fourth Amendment right against unreasonable seizures."); *Guerrero*, 2010 WL 670089, at *13 ("The constitutional violation alleged by the plaintiffs—that the police officers in this case used excessive force during their arrest—is a well-established and common claim."). Rather, as with the false arrest claim, their argument relies solely on their factual assertion that their conduct was reasonable. But, as set forth above, the well-pled allegations of the FAC plainly establish that under the framework set forth by the Supreme Court and the Fourth Circuit, the amount of force the Agents used was unreasonable. Therefore they are *not* entitled to qualified immunity. *See Jones*, 325 F.3d at 527-28 (applying *Graham* factors and assessing severity of injuries to determine if officer entitled to summary judgment on qualified immunity defense); *Smith*, 781 F.3d at 103 (noting that a "reasonable jury" would be entitled to find whether the officer's perceptions "would have been unreasonable").

**C.    Walker Is Not Entitled to Qualified Immunity on Mr. Johnson's *Monell* Claim**

As *Monell* liability was clearly established at the time of the Agents' conduct, and as the FAC alleges that Walker knew the agents were using wrongful, excessive force and engaging in unlawful seizures, Walker is not entitled to qualified immunity. To establish a qualified immunity defense, Walker must show that: (1) it was not "clearly established at the time of [his agents'] conduct that [Walker] could be held liable under §1983 for constitutional violations committed by" his agents; (2) it was not "clearly established at the time [Walker] was

supervising [his agents] that" engaging in seizures without probable cause and "the degree of force that [Walker] knew that [his agents were] using against arrestees was unconstitutional" and (3) that "a reasonable person in [Walker's] position" would have thought his actions were lawful. *See Shaw*, 13 F.3d at 801 (analyzing qualified immunity on summary judgment).

Here, Walker is not entitled to qualified immunity. First, *Monell* liability has been clearly established in the Fourth Circuit since 1984. *See Shaw*, 13 F.3d at 802. Thus, it was clearly established at all times relevant to the FAC that Walker could be held liable for his agents' conduct. Furthermore, the constitutional right to be free from both unlawful seizures and the use of excessive force by law enforcement has been established for decades. *See Harrison*, 640 F. Supp. 2d at 702 (unlawful seizures); *Shaw*, 13 F.3d at 802 (excessive force). Finally, no reasonable officer could have believed that allowing warrantless arrests without probable cause is constitutional, or that allowing brute, significant amounts of force to be used against unarmed arrestees who pose no risk of harm to the officers or anyone else is constitutional. Accordingly, on the facts alleged in the FAC and applicable law, Walker is not entitled to qualified immunity.

## VIII. Mr. Johnson Properly Alleges Assault and Battery Claims Against All of the Agents (Counts VI and VII)

Consistent with their general approach in this Motion, Defendants' attack on Mr. Johnson's properly pled assault and battery claims ignores the well-pled allegations in the FAC. In Virginia, to plead a viable claim for assault, the plaintiff must allege "that the defendant 'performed an act intended to cause either harmful or offensive contact with another person or apprehension of such contact, and that creates in the other person's mind a reasonable apprehension of an imminent battery.'" *Bowie v. Murphy*, 624 S.E.2d 74, 80 (Va. 2006) (quoting *Etherton v. Doe*, 597 S.E.2d 87, 89 (Va. 2004)). In *Bowie*, allegations that the assailant "attempted to strike [the plaintiff] with a camera, placing [the plaintiff] in fear of physical injury"

and then actually struck him were sufficient to state a claim for assault because "it asserted that [the assailant] intended to strike [the plaintiff] in the chest." *Id.* Here, Mr. Johnson has plainly alleged that the Agents "placed Martese in reasonable apprehension of bodily harm and/or harmful and/or offensive and unpermitted contact" and cites to numerous, specific examples of that misconduct. FAC ¶ 131. Moreover, the Agents' acts were "intentional" and intended to place Mr. Johnson "in reasonable apprehension of bodily harm and/or harmful and/or offensive and unpermitted contact with Martese's person." FAC ¶¶ 131-33. This is plainly sufficient to state a claim for assault under Virginia law.

Similarly, battery is "an unwanted touching which is neither consented to, excused, nor justified." *Koffman v. Garnett*, 574 S.E.2d 258, 261 (Va. 2003). Here, the FAC plainly alleges that each of the Agents' touching Mr. Johnson was "unwanted, unexcused, and unjustified." FAC ¶ 136. Furthermore, Mr. Johnson has alleged physical injuries, including facial lacerations requiring stiches, FAC ¶ 139-40, as well as bruising and swelling, FAC ¶ 52.

Defendants' fallback position that the Agents' assault and battery of Mr. Johnson was somehow legally justified is unavailing. As set forth above, the Agents' actions were unlawful and unjustified, as their use of force was unreasonable, negating this defense. *See Rowland*, 41 F.3d at 174 (finding excessive force claim should proceed as objective reasonableness factors weighed in plaintiff's favor, thus "parallel state law claim of assault and battery [are] subsumed within the federal excessive force claim and so go[] forward as well"); *Raiche v. Pietroski*, 623 F.3d 30, 40 (1st Cir. 2010) ("Where a plaintiff alleges both a §1983 excessive force claim and common law claims for assault and battery, [the] determination of the reasonableness of the force used under §1983 controls [the] determination of the reasonableness of the force used under the common law assault and battery claims.").

Moreover, this defense is factual and cannot be decided on a motion to dismiss. *See Crihfield v. City of Danville Police Dep't*, No. 4:07CV00010, 2007 WL 3003279, at *3 (W.D. Va. Oct. 11, 2007) (denying motion to dismiss as to qualified immunity, assault, and battery, as these claims and defenses are factual and could not be determined on a motion to dismiss); *see also Smith v. Ray*, 855 F. Supp. 2d 569, 583 (E.D. Va. 2012) *aff'd*, 781 F.3d 95 (4th Cir. 2015) (finding same disputed material facts that precluded summary judgment ruling on reasonableness of officer's use of force precluded resolution of state law claims for assault and battery). Defendants' Motion to Dismiss Mr. Johnson's assault and battery claims should therefore be denied.

## IX.    Mr. Johnson Properly Pled His Claim for Gross Negligence (Count IV)

"Gross negligence is defined as the 'absence of slight diligence, or the want of even scant care.' It is that degree of negligence that 'shows an utter disregard of prudence amounting to complete neglect of the safety of another.'" *McLenagan v. Karnes*, 27 F.3d 1002, 1009 (4th Cir. 1994) (quoting *Frazier v. City of Norfolk*, 362 S.E.2d 688, 691 (Va. 1987)). Gross negligence is a factual question to be decided by a jury. *Chapman v. City of Va. Beach*, 475 S.E.2d 798, 801 (Va. 1996). In *Chapman*, the Court found the jury verdict of gross negligence was supported by evidence showing the city's knowledge of a dangerous condition but failure to take any action. *Id.* at 801. In *Veney*, the court found a genuine question of material fact existed as to whether the officer was grossly negligent when he threw the plaintiff to the ground and arrested him for obstruction of justice, after finding the record supported plaintiff's position that no reasonable officer would have thought the arrest was lawful and that the use of force was unreasonable and excessive. 321 F. Supp. 2d at 747; *see also Valladares ex rel. Valladares v. Cordero*, No. 1:06CV1378 JCC, 2007 WL 773911, at *2 (E.D. Va. Mar. 8, 2007) (allegations that officer slammed a 15-year-old boy into a parked car when the boy tried to push the officer off his

brother stated a claim for gross negligence).

Here, Mr. Johnson sufficiently alleged that the Agents acted with a total lack of diligence, care, and completely neglected his safety. *See* FAC ¶¶ 118-120. Specifically, the Agents "showed an utter disregard of prudence amounting to a complete neglect of Martese's safety and Constitutional rights, when they willfully, knowingly, wrongfully, and/or recklessly assaulted Martese without any reasonable justification or provocation and unreasonably ignored other non-physical and/or non-violent options to ascertain whether Martese possessed or had used a fake identification card." FAC ¶ 118. These allegations, taken together with Martese's allegations regarding the Agents' constitutional violations, sufficiently state a claim for gross negligence. Indeed, Defendants' arguments to the contrary all revolve around the same disputed facts discussed throughout this Opposition. *See* Doc. No. 50 at 34-35. Thus, the Court should deny Defendants' Motion.

## X. Mr. Johnson States a Negligent Supervision and Training Claim Against Walker Under Virginia Law (Count V)

Defendants contend that Virginia does not recognize a tort for negligent supervision and training. However, Defendants ignore the growing trend among Virginia state and federal courts to allow negligent supervision and training claims to proceed, at least past the motion to dismiss stage. In *Hernandez v. Lowe's Home Centers, Inc.*, 83 Va. Cir. 210, 215 (Va. Cir. Ct. 2011), the court recognized a state law claim for negligent supervision. In doing so, the court distinguished *Chesapeake & Potomac Telephone v. Dowdy*, 365 S.E.2d 751 (Va. 1988), as *Dowdy* held only that there was no duty to supervise under the circumstances of that specific case (*i.e.*, in an employer-employee situation), *not* that a duty to supervise never exists at all. *Id.* at 213. As the Court in *Dowdy* never opined as to whether a claim for negligent supervision by a *third party* might be cognizable, the *Hernandez* court allowed the plaintiff's claim there to proceed. *See id*

(allowing plaintiff's claim to go forward against the defendant because the defendant's failure to supervise harmed a third party invitee—not the employee himself).

The *Hernandez* court further recognized that the Supreme Court of Virginia has recognized liability for negligent hiring and negligent retention. *Id.* at 214. In both contexts, an employer is liable when its failure to use reasonable care foreseeably creates a danger of harm to others. *Id.* Similarly, negligent supervision is simply another form of liability for negligence. *Id.* Thus, the court allowed the negligent supervision claim to proceed. *Id.* at 215; *see also Bush v. Serco, Inc.*, 2015 WL 5703116, *4 (Va. Cir. Ct. 2015) (overruling demurrer on negligent supervision claim, finding *Dowdy* distinguishable and the circuit court opinions declining to recognize negligent supervision as not binding).

Similarly, federal courts in Virginia, including this Court, have recognized the split of authority and opined, without deciding, that such a claim may be cognizable. *See Cook v. John Hancock Life Ins. Co. (U.S.A.)*, No. 7:12-CV-00455, 2015 WL 178108, at *13-14 (W.D. Va. Jan. 14, 2015) (recognizing that "several Virginia circuit courts . . . have interpreted *Dowdy's* holding as limited to its facts, and have allowed a negligent supervision claim to proceed, at least past the demurrer stage" but finding claim inadequately pled under facts of case); *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 16 F. Supp. 3d 636, 664 (W.D. Va. 2014) (in context of insurance coverage dispute, finding a plaintiff could present evidence of the insured's negligent supervision in the underlying case and request an instruction on it, thus finding a duty to defend by insurer); *Parker v. Wendy's Int'l, Inc.*, 41 F. Supp. 3d 487, 492 (E.D. Va. 2014) (recognizing split of authority in Virginia courts but declining to determine "whether a claim of negligent supervision would ever be cognizable under Virginia law" because the plaintiff failed to plead facts supporting such a claim); *see also Grubb v. Day to Day Logistics, Inc.*, No. 2:14-CV-01587,

2015 WL 4068742, at *13 (S.D. Ohio July 2, 2015) ("[t]his court agrees with *Hernandez's* analysis of Virginia law as it pertains to negligent supervision"); *Clark v. Computer Sci. Corp.*, 958 F. Supp. 2d 208, 214 (D.D.C. 2013) (implying that while Virginia has not officially recognized torts of negligent supervision and training that does not mean they do not exist); *Johnson–Kendrick v. Sears, Roebuck & Co.*, 39 Va. Cir. 314, 319 (Va. Cir. Ct. 1996) (stating that the *Dowdy* Court "did not opine that there would never be a situation in which an employer would have a duty to supervise an employee").

Recent cases have also recognized the viability of a negligent training claim. *See Bush*, 2015 WL 5703116, *4 (recognizing viability of negligent training claim, but finding plaintiff had not sufficiently pled it); *Hernandez*, 83 Va. Cir. 210, 214 (recognizing viability of negligent training claim); *Reynolds v. Crown Equip. Corp.*, No. CIV.A.5:07CV00018, 2008 WL 2465032, at *11 (W.D. Va. June 16, 2008) (Conrad, J.) (recognizing negligent training claim and in analyzing such claim against third-party, finding that "the continuing duty to train falls upon the master," not a third-party).

Given the recent authority recognizing claims for negligent supervision and training, the Court should allow Mr. Johnson's claim to proceed. As the FAC sets forth in detail, Walker, through his position, owed Johnson a duty to ensure that his agents were properly trained and supervised. FAC ¶ 124. Yet Walker failed to do so, despite knowing that his agents posed a serious risk of harm (just like the harm that befell Mr. Johnson), given his agents' history of excessive force in nonviolent situations. FAC ¶¶ 123, 127. Through his failure, Walker perpetuated, reinforced, and sanctioned such practices. FAC ¶ 126. Walker's failure to properly train and supervise his agents, despite knowing the threat involved, was a proximate cause of Martese's injuries because of the Agents' unreasonable and excessive use of force on him. FAC

¶ 128.  Accordingly, Mr. Johnson has sufficiently alleged his negligent supervision and training claims against Walker.  *See Trimyer v. Norfolk Tallow Co.*, 66 S.E.2d 441, 443 (Va. 1951) (under Virginia law, elements of tort claim are duty, breach, causation and damages).  The Court should therefore deny Defendants' Motion to Dismiss Count V.

## CONCLUSION

For all of the reasons stated herein, the Court should deny Defendants' Motion on all Counts.  To the extent the Court grants Defendants' Motion with respect to any Count, Mr. Johnson respectfully requests leave to amend that Count.


Dated: June 17, 2016                              Respectfully submitted,

                                         By:  s/ Benjamin G. Chew
                                                Benjamin G. Chew (VSB #29113)
                                                Joshua N. Drian (VSB #82061)
                                                Diana L. Eisner (admitted *pro hac vice*)
                                                Attorneys for Plaintiff
                                                MANATT, PHELPS & PHILLIPS, LLP
                                                1050 Connecticut Avenue, N.W., Suite 600
                                                Washington, DC  20036
                                                Telephone: (202) 585-6500
                                                Fax: (202) 585-6600
                                                Email:  BChew@manatt.com
                                                Email:  JDrian@manatt.com
                                                Email:  DEisner@manatt.com

                                                *Counsel for Plaintiff Martese Johnson*

## CERTIFICATE OF SERVICE

I hereby certify that on this 17th day of June, 2016, a true and correct copy of the

foregoing will be electronically filed with the Clerk of Court using the CM/ECF system, which

will then send a notification of such filing (NEF) to the following counsel of record:

Nicholas F. Simopoulos, Esq.
Alexander K. Page, Esq.
Office of the Virginia Attorney General
900 East Main Street
Richmond, Virginia 23219
Telephone: (804) 786-8199
Facsimile: (804) 371-2087
Email: nsimopoulos@oag.state.va.us
        apage@oag.state.va.us

s/ Benjamin G. Chew
Benjamin G. Chew (VSB #29113)
MANATT, PHELPS & PHILLIPS LLP
1050 Connecticut Avenue, Suite 600
Washington D.C. 20036
Telephone: (202) 585-6511
Facsimile: (202) 637-1522
Email: BChew@manatt.com